**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **HARDIE-TYNES, CO., INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  2:16-CV-1417-VEH** |
| | ) | |
| **SKF USA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION AND ORDER

### I.    Introduction

Plaintiff Hardie-Tynes, Co., Inc. ("Hardie-Tynes) initiated this commercial

action against SKF USA, Inc. ("SKF") on August 29, 2016. (Doc. 1). Invoking

diversity jurisdiction pursuant to 28 U.S.C. § 1332, Hardie-Tynes has alleged that

SKF supplied deficient bearings for the Matlacha Bridge Replacement Project in Lee

County, Florida (the "Project"). (Doc. 1 at 1; *id.* ¶ 1). On March 16, 2017, Hardie-

Tynes sought leave to amend its complaint to include a fraudulent suppression count.

(Doc. 28). After reviewing a round of briefing by the parties, the Court denied

Hardie-Tynes's Motion for Leave To Amend Complaint (the "Amend Motion") on

the grounds of futility on June 5, 2017. (*See generally* Doc. 39).

In compliance with the Court's 10-day deadline set out in Appendix III to the

Uniform Initial Order (doc. 11 at 26 § F), on June 15, 2017, Hardie-Tynes filed a Motion for Reconsideration (the "Reconsideration Motion"). (Doc. 40). Hardie-Tynes also requested oral argument. (Doc. 41).

On June 23, 2017, SKF opposed the Reconsideration Motion on the basis that Hardie-Tynes did not meet the discretionary standard on reconsideration. (Doc. 42). The Court then set the Reconsideration Motion for a hearing and a deadline for SKF to respond to the merits of Hardie-Tynes's arguments. (Doc. 43).

SKF filed its merits-based opposition on July 17, 2017. (Doc. 44). Hardie-Tynes followed with its reply on July 31, 2017. (Doc. 45). On August 4, 2017, Hardie-Tynes filed a Notice of Corrected Proposed Amended Complaint. (Doc. 46).

The Court held a hearing on the Reconsideration Motion on August 17, 2017. (Doc. 48 at 1); (*see also* Doc. 49 (transcript of proceedings held on August 17, 2017)). Consistent with that hearing, the Court granted the Reconsideration Motion in that Hardie-Tynes was given the opportunity to file an amended verified fraud count with "factual allegations consistent both with the pleading requirements arising under Rules 8 and 9 of the Federal Rules of Civil Procedure and the substantive elements arising under APJI 18.05 and 18.08." (Doc. 9 at 2-3).

Hardie-Tynes filed an amended complaint with verified fraudulent suppression allegations on August 31, 2017. (Doc. 50). SKF followed with a Motion To Dismiss

Plaintiff's Amended Complaint (Verified as to Count Four) (doc. 53) (the "Dismissal Motion") on September 25, 2107. The parties have briefed the Dismissal Motion.[1] (Docs. 54, 55). As analyzed below, the Dismissal Motion is **GRANTED IN PART** and otherwise is **DENIED**.[2]

## II. Standards

### A. Rule 12(b)(6)

A Rule 12(b)(6) motion attacks the legal sufficiency of the complaint. *See* FED. R. CIV. P. 12(b)(6) ("[A] party may assert the following defenses by motion: (6) failure to state a claim upon which relief can be granted[.]"). The Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement

---

[1] "To avoid duplication, SKF [has stated that it] incorporates its prior arguments and legal citations and limits its discussion [in its Dismissal Motion] to the specifics related to [Hardie-Tynes]'s Amended Complaint." (Doc. 53 at 3). This Court has admonished other parties for engaging in such a disfavored briefing practice. Shotgun-briefing (*i.e.*, wholesale incorporation of previously filed briefs without even bothering to include any parenthetical arguments and/or pinpoint references) oftentimes makes organizing and deciding a disputed legal issue much more difficult for the Court. Further, SKF's election to do this is not without potential legal pitfalls because "[u]nder the adversary system, it is counsel's responsibility to explain why these [former] points have legal merit; the Court does not serve as counsel's law clerk." *Federal Ins. Co. v. County of Westchester*, 921 F. Supp. 1136, 1139 (S.D.N.Y. 1996); (*see also* Doc. 54 at 5 ("SKF cannot simply rely on a prior denial of leave to amend as to an entirely different pleading as grounds for dismissal of the current Amended Complaint which contains different allegations.")). Thus, this Court has primarily focused on the arguments and authorities raised by the parties in the most current round of briefing.

[2] Additionally, SKF has requested oral argument. (Doc. 56). As mentioned above, the Court held a hearing covering this same subject matter on August 17, 2017. Further, a transcript of that hearing is part of the record. (Doc. 49). Consequently, the Court is very familiar with the issues and finds that a second hearing is unnecessary. Therefore, SKF's request for oral argument is **DENIED**.

of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957) (footnote omitted) (quoting FED. R. CIV. P. 8(a)(2)), *abrogated by Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007); *see also* FED. R. CIV. P. 8(a) (setting forth general pleading requirements for a complaint including providing "a short and plain statement of the claim showing that the pleader is entitled to relief").

While a plaintiff must provide the grounds of his entitlement to relief, Rule 8 does not mandate the inclusion of "detailed factual allegations" within a complaint. *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964 (quoting *Conley*, 355 U.S. at 47, 78 S. Ct. at 103). However, at the same time, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563, 127 S. Ct. at 1969.

"[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950. "While legal conclusions can provide the framework of a complaint, they must be supported by

factual allegations." *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine <u>whether they plausibly give rise to an entitlement to relief</u>." *Id.* (emphasis added). "Under *Twombly*'s construction of Rule 8 . . . [a plaintiff's] complaint [must] 'nudge[] [any] claims' . . . 'across the line from conceivable to plausible.' *Ibid.*" *Iqbal*, 556 U.S. at 680, 129 S. Ct. at 1950-51.

A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).

**B.    Rule 9(b)**

FED. R. CIV. P. 9(b) states:

> **(b) Fraud or Mistake; Conditions of Mind.** In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

*Id.*; *see also* ALA. R. CIV. P. 9(b) (similar).

The Eleventh Circuit has synthesized the following framework for applying the Rule 9(b) standard:

"The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *Durham v. Bus. Management Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)).[3] The application of Rule 9(b), however, "must not abrogate the concept of notice pleading." *Id.* Rule 9(b) is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997) (internal quotation omitted).

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

Relying upon pre-*Bonner* Fifth Circuit precedent,[4] the Supreme Court of Alabama has explained how a litigant pleads fraud with sufficient particularity:

Rule 9(b), ARCP, provides that when fraud is alleged the circumstances constituting the fraud shall be stated with particularity. This does not require every element to be stated with particularity, but the pleader must use more than generalized or conclusionary statements setting out the fraud. The pleader must state the time, the place, the contents or substance of the false representations, the fact misrepresented, and an identification of what has been obtained. *See* Committee Comments to Rule 9(b), ARCP.

---

[3] *Seville* was abrogated in part on other grounds by *Twombly* as recognized by *Travelers Indem. Co. v. Cephalon, Inc.*, 620 F. App'x 82, 86 (3d Cir. 2015).

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Robinson v. Allstate Ins. Co.*, 399 So. 2d 288, 289-290 (Ala. 1981) (emphasis added) (citing *Rubens v. Ellis*, 202 F.2d 415 (5th Cir. 1953)); *see also Rubens*, 202 F.2d at 417 ("The form of these allegations is wholly insufficient under Civil Rule 9(b), which requires that in all averments of fraud or mistake, the circumstances constituting such fraud or mistake <u>shall be stated with particularity</u>.") (emphasis added); *id.* (describing plaintiff's collateral attack of a prior judgment on the ground of fraud as "only a categorical assertion" that inadequately "amounts only to a conclusion").

## III.  Analysis

### A.  Preliminary Considerations

Hardie-Tynes's amended complaint adds a fourth claim against SKF–one for fraudulent suppression. (Doc. 50 at 9-27 ¶¶ 31-90). As previously recognized by this Court, the elements of fraudulent suppression under Alabama law are "(1) that [SKF] had a duty to disclose the existing material fact; (2) that [SKF] suppressed this material fact; (3) that [SKF]'s suppression of this fact induced [Hardie-Tynes] to act or to refrain from acting; and (4) that [Hardie-Tynes] suffered actual damage as a proximate result."[5] *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 837 (Ala.

_____

[5]  "'Under the *Erie* doctrine, a federal court adjudicating state law claims applies the substantive law of the state.'" *Sphinx Intern., Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 412 F.3d 1224, 1227 (11th Cir. 2005) (quoting *Ungaro-Benages v. Dresdner Bank AG*, 379

1998) (citing *Booker v. United American Ins. Co.*, 700 So. 2d 1333, 1339 (Ala. 1997)). Additionally, the Code of Alabama clarifies that:

> Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.

Ala. Code § 6-5-102.[6]

Further, "[t]he question whether a party had a duty to disclose is a question of law to be determined by the trial court." *Barnett v. Funding Plus of Am., Inc.*, 740 So. 2d 1069, 1074 (Ala. 1999) (citing *Owen*, 729 So. 2d at 838). In deciding this threshold issue, this Court must consider:

> (1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances.

*Owen*, 729 So. 2d at 842-43; *see also Sirmon v. Wyndham Vacation Resorts, Inc.*, 922 F. Supp. 2d 1261, 1285 & n.19 (N.D. Ala. 2013) (same) (citing *Owen*, 729 So. 2d at 842-43).

When previously determining that Hardie-Tynes's prior fraudulent suppression

---

F.3d 1227, 1232 (11th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938))). Here, both sides agree that Alabama law substantively applies to Hardie-Tynes's fraudulent suppression claim.

[6] Here there is no allegation of a duty to disclose arising from a confidential relationship.

count was futile, the Court's ruling was based entirely upon *Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc.*, 611 So. 2d 238 (Ala. 1992) (relied upon by SKF). As the Supreme Court of Alabama stated in *Bama*, "[w]hen the parties to a transaction deal with each other at arm's length [and] with no confidential relationship, no obligation to disclose arises when information is not requested." 611 So. 2d at 246. This Court then found that the allegations of Hardie-Tynes's formerly proposed amended complaint reflected an arm's length relationship between it and SKF and no plausible confidential relationship. (Doc. 39 at 6-7). The Court further concluded that Hardie-Tynes's fraudulent suppression claim lacked an allegation that amounted to a question and, as a result, no plausible duty to disclose existed under the fraudulent suppression framework utilized in *Bama*. (Doc. 39 at 7). As a result, the Court denied Hardie-Tynes's Amend Motion as futile.

However, in *Aliant Bank v. Four Star Investments, Inc.*, No. 1150822, 2017 WL 1787935 (Ala. May 5, 2017), the Alabama Supreme Court more recently clarified that *Bama* is <u>not</u> the exclusive way in which a fraudulent suppression claim can plausibly arise between two commercial entities. In finding a triable fraudulent suppression claim in the commercial setting presented there, the *Aliant* court explained:

Aliant has alleged that Smith[7] represented to it that the bond proceeds would be used to develop 270 additional lots in Twelve Oaks while allegedly knowing that he and/or his companies would actually receive the majority of the bond proceeds for work that had already been performed in association with the development of the first 80 lots. In *CNH America, LLC v. Ligon Capital, LLC*, 160 So. 3d 1195, 1202-03 (Ala. 2013), we explained that " 'once a party elects to speak, he or she assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated' " (quoting *Freightliner*, 932 So. 2d at 895). *See also First Alabama Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1056 (11th Cir. 1990) ("Finally, even if one is not under a duty to speak, if he decides to do so, 'he must make a full and fair disclosure,' without concealing any facts within his knowledge." (quoting *Ellis v. Zuck*, 409 F. Supp. 1151, 1158 (N.D. Ala. 1976), and citing *Jackson Co. v. Faulkner*, 55 Ala. App. 354, 315 So. 2d 591 (1975))). Thus, once Smith represented how the bond proceeds would be used, he had a duty to make a full disclosure as to how those proceeds would be used. Aliant has submitted evidence indicating that Smith failed to fulfill that duty and instead concealed the truth about how the bond proceeds would be used, thus inducing Aliant to execute the mortgagee-special-assessment acknowledgment and resulting in subsequent injury to Aliant. Accordingly, the summary judgment entered on the fraudulent-suppression claims asserted against Smith and Twelve Oaks Properties is due to be reversed.

*Aliant*, 2017 WL 1787935, at *25.

In light of *Aliant*, the Court agrees with Hardie-Tynes that "Alabama law clearly recognizes the plausibility of a fraudulent suppression claim in the context of commercial transactions when[,] after a party elects to speak, that party conceals facts

---

[7] The introduction section of the *Aliant* opinion indicates that "Smith" stands for Defendant Bobby R. Smith, Jr. ("Mr. Smith") who owned and operated Twelve Oaks Properties, Inc. 2017 WL 1787935, *1. Mr. Smith managed development of the Twelve Oaks subdivision (located in Odenville, Alabama) through Defendant Twelve Oaks Properties, Inc. *Id.*

that would materially qualify the prior statement." (Doc. 40 at 7); *see also Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. Catherine of Siena Par.*, 790 F.3d 1173, 1182 (11th Cir. 2015) ("As a federal court sitting in diversity, we are bound to follow 'the latest statement of state law by the state supreme court.'" (quoting *World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*, 586 F.3d 950, 957 (11th Cir. 2009))). Importantly, one of the primary authorities that causes this Court to reach this conclusion is a case which was not only mentioned by *Aliant*, but which SKF has relied upon to support its position–*CNH Am., LLC v. Ligon Capital, LLC*, 160 So. 3d 1195 (Ala. 2013). (Doc. 44 at 7).

*CNH* involved a commercial dispute between a parent company and its subsidiary hydraulic-cylinder supplier and a purchaser. 160 So. 3d at 1198. The plaintiffs brought suit against the purchaser asserting claims of breach of contract, fraudulent misrepresentation, and fraudulent suppression. *Id.* The jury returned a verdict for the plaintiffs on fraudulent suppression and the purchaser appealed. *Id.*

The "gravamen of [the plaintiffs'] fraudulent-suppression claims [wa]s that [the purchaser] decided in approximately September 2007 to replace [the subsidiary supplier] of cylinders and then fraudulently suppressed that fact from [the supplier] for approximately eight months, inducing [the plaintiffs] to take actions and expend funds in an impossible attempt to foster an ongoing relationship between [the

subsidiary supplier] and [the purchaser]." 160 So. 3d at 1201. On appeal, the purchaser denied both that it had decided to end its relationship with the subsidiary supplier in 2007 "and that it had any duty to disclose to [the plaintiffs] that it was terminating its relationship with [the subsidiary supplier] before it did so in May 2008." *Id.* The Supreme Court of Alabama ultimately rejected the purchaser's duty-to-disclose contention, as discussed in more detail below. *See CNH*, 160 So. 3d at 1201-03 (analyzing duty-to-disclose element).

As SKF previously argued in pertinent part concerning the import of *CNH*:

[T]he *Aliant* court relied upon a prior decision in *CNH America, LLC v. Ligon Capital, LLC*, 160 So. 3d 1195, 1201-1202 (Ala. 2013), wherein the Alabama Supreme Court held that "in a commercial transaction involving arm's length negotiations, the parties have no general obligation to disclose any specific information to the other, but each has an affirmative duty to respond truthfully and accurately to direct questions from the other." In that case, in response to a question from the plaintiff, the defendant provided information that was materially inaccurate. *Id.* at 1202. Given that the *Aliant* Court did not recede from the rulings in *Bama Budweiser* and *Norman*, and given that the *Aliant* Court relied upon *CNH America*, it must be presumed that the *Aliant* borrower's alleged statement was made in response to a request/direct question from the lender.

Unlike *Aliant* and *CNH America*, there is no allegation in the proposed amended complaint that the allegedly misleading language within the February 2011 email was provided by SKF in response to and as a specific answer to a question posed by Plaintiff. In fact, Plaintiff makes no allegation about the circumstances under which the information was provided by SKF.

(Doc. 44 at 7 (emphasis added)).

Thus, SKF suggested that *CNH* reaffirms the Court's previous *Bama*-based ruling that, in the absence of a direct inquiry from a commercial plaintiff, no cognizable duty for a commercial defendant to disclose information arises. SKF's position, however, is directly undermined by *CNH*'s <u>complete</u> analysis, in which the court upheld the jury verdict in favor of the plaintiff on the challenged fraudulent suppression claims. More particularly, while the *CNH* court did discuss how a sufficiently specific question can create a duty to disclose in a commercial dispute, 160 So. 3d at 1202, importantly, its analysis of that element did not end there.

> Moreover, <u>even if we were to conclude that Campbell's questions were not reasonably specific and direct, this Court also stated in *Freightliner* that "once a party elects to speak, he or she assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated.</u>" 932 So. 2d at 895. Ligon and HTI argue that once Selvan told Campbell that "CNH needed [HTI] in the short term and long term, we are committed," he and CNH assumed the duty to make a full and fair disclosure without concealing other relevant facts within his knowledge. *See First Alabama Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1056 (11th Cir. 1990) ("Finally, <u>even if one is not under a duty to speak, if he decides to do so, 'he must make a full and fair disclosure,' without concealing any facts within his knowledge.</u>" (quoting *Ellis v. Zuck*, 409 F. Supp. 1151, 1158 (N.D. Ala. 1976), and citing *Jackson Co. v. Faulkner*, 55 Ala. App. 354, 315 So. 2d 591 (1975))). There can be no dispute but that the fact that CNH had already decided to replace HTI <u>materially qualified Selvan's statement</u> that CNH was "committed" to HTI. "<u>The duty imposed on the speaking party is to disclose those facts that are material to the ones already stated so as to make them truthful.</u>" *Freightliner*, 932 So. 2d at 895. *See also*

*Ellis*, 409 F. Supp. at 1158 ("So it is that if a franchisee raises a question the franchisor must avoid half-truths."). <u>Thus, even if a duty to disclose was not otherwise created by Campbell's questions, that duty was certainly assumed by CNH when Selvan and Canali voluntarily spoke of CNH's long-term commitment to HTI.</u>

*CNH*, 160 So. 2d at 1202-03 (emphasis added).

Thus, *CNH* makes it clear what *Bama* does not,[8] that a duty to disclose can arise between two commercial parties under Alabama law <u>even in the absence of a specific question</u> when a commercial defendant affirmatively speaks, but fails to disclose facts that materially qualify that statement. *Id.*; *see also Aliant*, 2017 WL 1787935, at *25 (citing to *CNH* as well as other authorities and determining in a commercial bond setting that "once [the defendant] represented how the bond proceeds would be used, he had a duty to make a full disclosure as to how those proceeds would be used"); *cf. also Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So. 2d 883, 895 (Ala. 2005) (recognizing in a commercial case that "once a party elects to speak, he or she assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated"); *id.* (clarifying that such "party does not assume a duty to divulge all information that *may be* or *may become* relevant to

---

[8]  The fraud claim at issue in *Bama* did not trigger consideration of a duty to disclose premised upon material qualifying facts related to a statement affirmatively made by a commercial party. Instead, the court dealt <u>only</u> with an alleged "*Fraud by Silence*" arising in a commercial dispute. *Bama*, 611 So. 2d at 245-46.

the other party" but rather that "the speaking party is to disclose those facts that are material to the ones already stated so as to make them truthful") (emphasis in original); *First Alabama Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1056 (11th Cir. 1990) ("Finally, even if one is not under a duty to speak, if he decides to do so, 'he must make a full and fair disclosure,' without concealing any facts within his knowledge." (quoting *Ellis v. Zuck*, 409 F. Supp. 1151, 1158 (N.D. Ala. 1976)), *declined to follow on other grounds as stated in U.S. Fid. & Guar. Co. v. Bass*, 619 F.2d 1057, 1060 n.7 (5th Cir. 1980)).

SKF's prior efforts to discount the meaning of *Aliant* (by reading into that opinion a predicate question as triggering the duty to disclose <u>even though no prior inquiry was ever mentioned in the opinion</u>, 2017 WL 1787935, at *25) and to persuade this Court that only a question can plausibly create a duty to disclose under the circumstances of this commercial case are unavailing in light of the full scope of *CNH* upon which *Aliant* relies. Additionally, SKF made no attempt to distinguish *Freightliner*, an Alabama Supreme Court decision which predates *Aliant* by over a decade and *CNH* by nine years and which similarly indicates that a duty to disclose can arise when a commercial party elects to speak,[9] even though Hardie-

---

[9] *Freightliner* involved a commercial dispute over the purchase of trucks. 932 So. 2d at 885. While the Alabama Supreme Court ultimately rejected the fraudulent suppression claim, finding insufficient evidence to support a duty to disclose in its post-judgment review, it

Tynes cited to *Freightliner* for that proposition in its Reconsideration Motion. (Doc. 40 at 6 n.1).

Most recently, SKF concedes that a duty to disclose can arise when a commercial party elects to speak, but withholds material information concerning the topic of discussion:

> It is also not disputed that, <u>under Alabama law, a duty to disclose information may arise when an entity elects to speak on a certain subject</u>. However, as set forth above, the instances of SKF electing to speak identified within the Amended Complaint are not different at all from the instances identified in the prior proposed Amended Complaint which this Court found to not state a cause of action for fraudulent suppression.

(Doc. 53 at 9-10 (emphasis added)). In reply, SKF mentions the election-to-speak theory in the introductory section. (Doc. 55 at 2). However, SKF offers no substantive analysis of that theory's viability in light of Hardie-Tynes's amended complaint. (*See id.* at 2-6 (limiting analysis to fraudulent suppression premised upon a request for information)).

Thus, in sharp contrast to SKF's prior assertion that "the <u>only</u> avenue by which [Hardie-Tynes] could even endeavor to establish a 'duty to disclose' would be if the

---

expressly evaluated whether certain evidence showing defendant's initiation of a topic with the plaintiff met the elects-to-speak framework. 932 So. 2d at 894-95. Both *CNH* and *Aliant* rely upon *Freightliner* when discussing how a party's election to speak may create a duty to disclose between commercial parties. *CNH*, 160 So. 2d at 1202-03; *Aliant*, 2017 WL at 1787935, at *25.

allegedly suppressed information was 'requested'" (Doc. 54 at 6 (emphasis added) (some internal quotation marks omitted) (quoting Doc. 44 at 4)), SKF has reversed its position. SKF now agrees with Hardie-Tynes that Alabama law recognizes that a duty to disclose may arise when a commercial party elects to speak. Nonetheless, without pointing to any analysis, SKF contends that Hardie-Tynes has no plausible fraudulent suppression claim because of the Court's denial of the Amend Motion. More specifically, SKF urges that this Court has already found Hardie-Tynes's electing-to-speak allegations to be inadequate and that nothing contained in the amended complaint is meaningfully different from what this Court previously analyzed. The problem with SKF's position is that this Court has not yet assessed the plausibility of SKF's allegations under an election-to-speak theory.

In sum, after studying the parties' arguments made and authorities cited in their various briefs, the Court concludes that its prior *Bama*-based futility ruling in denying the Amend Motion was incomplete. More specifically, the Court did not account for Alabama's recognition that a plausible duty to disclose can arise between two commercial parties (even in the absence of a direct question) when one elects to speak without disclosing facts that would materially alter the meaning of that prior statement. Consequently, the Court never evaluated whether Hardie-Tynes's allegations plausibly established a duty to disclose based upon that alternative theory.

**B.      Hardie-Tynes has failed to state a plausible fraudulent suppression claim based upon a question, but has stated one in light of SKF's election to speak about its experience and the overall context of the parties' communications that preceded SKF's voluntary statement.**

Having determined that Hardie-Tynes has another potential avenue for asserting fraudulent suppression against SKF, the Court now examines the amended complaint. The Court's inquiry is twofold–whether Hardie-Tynes's verified allegations in Count Four plausibly support a fraudulent suppression claim (in light of APJI 18:05 and 18:08) and whether they are sufficiently particularized pursuant to Rule 9(b)'s mandate.

Hardie-Tynes's amended complaint includes the following fraudulent suppression allegations:

> 31.    Hardie-Tynes realleges the allegations set forth in paragraphs 1-30, above.
>
> 32.    As discussed in more detail below, SKF suppressed and concealed the following material facts:
>
> > (a) SKF had no experience with the subject bearing configuration;
> >
> > (b) the subject bearing configuration had not been used on similar projects prior to the Matlacha project; and
> >
> > (c) certain European movable bridges identified as having successfully utilized SKF bearings in the past were in fact wholly dissimilar to the Matlacha bridge project.

33.     SKF's duty to disclose these material facts to Hardie-Tynes arose from three separate and distinct sets of circumstances:

(a) in responding to express requests for information, SKF owed Hardie-Tynes a duty to speak truthfully and not to conceal or suppress any material facts responsive to these requests;

(b) in electing to speak on its experience with the types of bearings at issue–regardless of whether the information provided was in response to an express request for information–SKF assumed a duty not to suppress or conceal facts materially qualifying those statements to Hardie-Tynes;

(c) in trumpeting its own experience with the subject bearings and proclaiming that the bearings had been successfully utilized on prior projects, special circumstances arose whereby SKF assumed a duty to disclose material facts that directly contradicted these assurances made to Hardie-Tynes by SKF.

34.     SKF's concealment of these material facts induced Hardie-Tynes to purchase the subject bearings from SKF under the belief that SKF had experience with this type of bearing configuration and that the bearings would work for the Matlacha project. This concealment further induced Hardie-Tynes to engage SKF to supervise the installation of the bearings and, after problems arose with the bearings due to SKF's wrongful conduct, to engage SKF to assist in the troubleshooting process.

35.     SKF's suppression was not limited to the time of sale; rather SKF continued suppressing these material facts so as not to lose an important, million-dollar-per-year customer in Hardie-Tynes and to develop industry-wide recognition as plain bearing experts. By suppressing the material information, SKF hoped to have the benefit of continued future business with SKF and maintain its credibility in the

movable bridge industry.

32.[10] On March 23, 2007, in the early design phase for the Matlacha project, E. C. Driver & Associates (the engineer of record for the project) requested that SKF provide a recommendation for a maintenance-free spherical plain bearing for use on the Matlacha project, information regarding how such bearing would work for this particular application, and whether SKF preferred spherical plain bearings over spherical roller bearings.

33.     On March 27, 2007, David Winkel, national account manager for SKF, agreed to provide a quote for two SKF maintenance-free spherical plain bearings known as "GEP 750 FS," with axially-split outer rings.

34.     On April 2, 2007, SKF provided a price for two GEP 750 FS bearings with axially-split outer rings, although SKF admitted that "[w]e have no experience in producing this big bearing so please be careful in doing your offer."

35.     By October 20, 2009, E. C. Driver had completed the design for the Matlacha project, and the specifications called for two "GEP 630 FS" bearings.

36.     The Matlacha bridge is a single leaf trunnion bascule bridge, a type of bridge more commonly referred to as a drawbridge. One of the main design elements is the trunnion assembly, including the machinery that permits the drawbridge to rise and lower. The bridge has a single leaf, meaning only one section of the bridge moves. This movable section is supported by structural steel that is attached to a horizontal steel shaft called a "trunnion shaft" or "trunnion" that serves as the bridge's horizontal axis.

---

10  SKF's paragraph numbering in Count Four contains some duplication. Specifically, paragraphs 32-35 are used twice. The Court has retained SKF's repetitive numbering for the purpose of this opinion.

37.     The design utilizes two bearings, one "fixed" bearing and one "floating" bearing. The only difference between the two is the floating bearing provides a gap to accommodate thermal expansion, while the fixed bearing does not.

38.     SKF's spherical plain bearings have two main components, a one-piece inner ring and a two-piece outer ring. The inner ring fits around the trunnion shaft so that the inner ring and the trunnion shaft rotate together within the outer ring. The outer ring of the bearing does not move and is connected to the bearing housing.

39.     The initial design specified an axially-split two-piece outer ring, similar to a clam shell (a horizontal split). SKF's first quote for the Matlacha bearings provided axially-split outer rings and this design accommodated movement within the floating bearing with a one-quarter inch gap between the housing and the outer ring. As shown in the diagram below, the inner ring was connected to the trunnion by a bolted plate and no space existed between the trunnion and the inner ring. Under the original design, the floating bearing accommodated for axial expansion by allowing the entire bearing and trunnion to move within the housing.



40.    On November 4, 2009, SKF began deviating from the initial design. Despite initially indicating that the bearings were available with axially-split outer rings, SKF represented to both E. C. Driver and Hardie-Tynes that the bearings were available only with radially-split outer rings. In internal correspondence, SKF acknowledged that "[t]his is not how it is shown on the [E. C. Driver] drawing."

41.    In late December 2010 and early January 2011, Hardie-Tynes began discussing a potential purchase order with SKF for two GEP 630 FS bearings for the Matlacha project. After SKF represented to Hardie-Tynes that the bearings were only available with radially-split outer rings, Hardie-Tynes began questioning how this bearing configuration would work, specifically how a radially-split bearing could accommodate for float. Hardie-Tynes requested SKF to provide information regarding whether this bearing configuration was commonly used and whether the radially-split bearings would work for the project.

42.    SKF recommended three design modifications to accommodate the radially-split outer rings: (1) change the housing to eliminate the one-quarter inch gap; (2) clamp the outer rings together within the housing; and (3) change the hardness of the trunnion to allow for thermal expansion between the shaft and inner ring. In other words, the radially-split bearing would accommodate float with axial expansion between the trunnion and the inner ring, whereas the original design provided for no gaps between the trunnion and inner ring.



43.    On January 25, 2011, Hardie-Tynes submitted to E. C. Driver a Request for Information ("RFI 28") regarding SKF's recommendations:

> Contract drawing M-9 shows the quarter inch float each side of one of the bearing housings for expansion. SKF has informed us that the model GEP 630 FS plain spherical bearing that is specified has a split outer ring and should have fixed contact with the housing. Any expansion or float should be accommodated with movement between the trunnion and the inner race of the bearing. To accomplish this, the bearing journal on the trunnion should have a clearance fit with the bearing and the trunnion journal that will be in contact with the bearing should have a 50RC hardness and be elongated to provide float. Please advise if SKF's recommended method for proving float is acceptable, how much float is required and if hardening the journal with an adverse effect on the trunnion.

44.    In late January 2011, Hardie-Tynes again requested SKF to provide information regarding whether the radially-split SKF bearings would work for the Matlacha project, and voiced concerns to SKF about the trunnion spinning inside the inner ring since the inner ring would no longer be clamped to the trunnion.

45.    In late January and throughout February 2011, E. C. Driver, SKF, and Hardie-Tynes all had collective and separate conversations regarding the use and configuration of the SKF bearings.

46.    In addition to Hardie-Tynes'[s] apprehension about the SKF bearings, on February 2, 2011, during the collective back and forth surrounding the design change due to SKF's radially-split bearing, an engineer with E. C. Driver, Mike Carlton, emailed SKF and admitted that "[i]f we knew it was going to be this much trouble we might just have specified a roller bearing."

47.    In the same email to SKF, Mr. Carlton acknowledged that

SKF had been "going back and forth with Mike Morton from Hardie-Tynes on the subject." Mr. Carlton further stated, "I have a question myself. How is the surface between the inner race of the bearing and the trunnion lubricated?"

48.     In response, Gill Detweiler (an application engineering consultant for SKF) told Mr. Carlton he would send his inquiry to SKF's "plain bearing engineers in Germany and will get back to you as soon as I hear from them. It is my opinion that the movement between bearing bore and hardened shaft is small enough so that wear is not an issue."

49.     On February 11, 2011, SKF had not yet responded to Hardie-Tynes'[s] or E. C. Driver's requests for information. Mr. Carlton again emailed Mr. Detweiler asking if he had heard "anything about this yet." Mr. Carlton also stated that "Hardie-Tynes also had a question about the hardness of the trunnion at the inside corner of the bearing."

50.     On February 16, 2011, Mr. Carlton again emailed Mr. Detweiler, asking "[w]hat prevents the trunnion shaft from rotating in the [inner ring] other than friction? . . . I'm not concerned about this happening short term, but long term with bridge maintenance the way it is makes me a little concerned. We were discussing fixing both bearings and have the housing slide. What are your thoughts?"

51.     Also on February 16, 2011, in an internal E. C. Driver email, Mr. Carlton admitted that he was "waiting for SKF to reply to questions about trunnion bearing design. Based on their answer we may change the design of the floating bearing."

52.     On February 21, 2011, Mr. Carlton again emailed Mr. Detweiler asking for additional information:

> I guess you are still waiting on an answer from your engineers, but I do want to verify that the design will function as intended for the life of the bearing. I am a little nervous about the shaft moving relative to the bearing, especially since there is no lubrication between those two

surfaces that I am aware of . . . What prevents the shaft from rotating relative to the ball? I am assuming that friction is the only means to prevent this . . . I am not questioning the design, I just want confirmation from SKF that the shaft moving axially within the bearing is not going to cause other problems elsewhere for the life of the bearing.

53.    On February 22, 2011, in response to the multiple questions posed and requests submitted by both Hardie-Tynes and E. C. Driver regarding the feasibility of using the radially-split SKF bearings, Mr. Detweiler sent the following email to Mr. Carlton (E. C. Driver) and Mr. Morton (Hardie-Tynes): "Good news SKF has many years experience with plain bearings in bridges in Europe and particularly in Holland." SKF represented to Hardie-Tynes that the Matlacha configuration (*i.e.*, radially-split outer rings) and design was common in Europe and SKF had many recent, successful bearing-applications on similar projects.

54.    On March 1, 2011, after receiving the February 22, 2011 email from SKF, E. C. Driver approved SKF's recommended design modifications to accommodate the radially-split outer rings.

55.    On June 16, 2011, following SKF's representations and assurances regarding the bearing configuration, Hardie-Tynes purchased two GEP 630 FS bearings from SKF.

56.    On September 8, 2011, after securing the purchase order but before the bearings were installed, Mr. Detweiler (SKF) sent an email to several of his SKF colleagues with the following:

We will have to convey this to our customers. It is understood that mounting large plain bearings for bridge applications is common for SKF in Europe but it is not common for us in the US so we need some help here. This is the first mounting of a bridge bearing in the US that is being supervised by SKF applications engineering and it is very important for us to look like we know what we are doing so we can continue selling SPB's for bridges in the US. It is hoped that we can use

this project as an example of our expertise in this application to show our customers that we are experts in [spherical plain bearings].

57.     The bearings were installed in late February 2012. SKF supervised the installation of the bearings pursuant to its agreement with Hardie-Tynes. On February 15, 2012, Mr. Detweiler admitted in an internal SKF email that "[t]his is really our first [spherical plain bearing] in a bridge."

58.     On March 2, 2012, Mr. Detweiler acknowledged the importance of this project and the potential effect on SKF's future business: "[f]or the sake of our future business in [spherical plain bearings] for bridges possible negative outcomes should be avoided."

59.     On August 22, 2012, prior to the project's completion and before the bridge was commissioned, the floating bearing began producing high-pitched screeching noises while the fixed bearing produced a low grumbling noise. The noises were indicative of a problem with the bearings.

60.     By August 28, 2012, SKF acknowledged that the trunnion shaft was turning within the inner ring on the floating bearing–the exact scenario that E. C. Driver and Hardie-Tynes questioned in 2011 given the radially-split outer rings and SKF's proposed modifications.

61.     Hardie-Tynes    requested    SKF    to    assist    in    the troubleshooting of the bearings, in part because SKF manufactured the bearings, represented itself as having pertinent experience with spherical plain bearings in similar applications, and because SKF was integral in the design modifications which ultimately contributed to the noise issue.

62.     On August 29, 2012, in an internal SKF email, Rudy Bonfini (SKF applications engineer and manager) stated that "[t]his is a rare design in the US and therefore we have very little knowledge on what is normal and not normal. Apparently it is a common design in Germany . . ."

63.     On September 4, 2012, in an internal SKF email, Randy Greaser (in SKF's service division) stated: "Another bridge problem. The contractor will be blaming the SKF bearing for late bridge opening! There are liquidated damages. Essentially, the shaft is spinning in the bearing, not the spherical plain bearing surfaces. We are getting SKF Germany involved!"

64.     The next day, September 5, 2012, in an internal SKF email, Mr. Greaser stated that SKF needed to "[g]enerate some creative ideas to get the current bearing to stop spinning." In a reply email, SKF's regional sales director stated that "[t]his has the potential to be a huge negative impact . . ."

65.     On September 5, 2012, Mr. Bonfini emailed two engineers with SKF Germany and asked "[i]s the configuration of the floating bearing typical for the bridges in Europe, *i.e.*, floating in the bore of the bearing for shaft expansion? Is this a common design in Europe and if so, did SKF recommend this configuration or did the bridge designer copy it based on existing designs?"

66.     SKF Germany never responded to Mr. Bonfini's comment. Instead, Juergen Scholer, product line and business development manager for SKF and part of SKF Germany, responded on September 11, 2012 that SKF "should protect SKF on both sides [sic] sales and factory against unjustified claims."

67.     By September 20, 2012, SKF identified the problem as a "slip stick" phenomenon, which was causing the trunnion to spin within the inner ring. The proposed solution involved pinning the trunnion to the inner ring to ensure the trunnion and the inner ring spun in tandem.

68.     On September 24, 2012, Lynn Taylor from Hardie-Tynes requested SKF to provide a list of "[a]ny projects this type bearing has been used on," essentially the same request Mr. Bonfini (of SKF) made to SKF Germany on September 5, 2012. Mr. Taylor's email set off a flurry of responses within SKF.

69.    In an internal SKF email sent in response to Mr. Taylor's email, Mr. Greaser (SKF) said "I think the answer will be nothing recent. Apparently, this is not a common design. Gill, who promoted this concept? We have been telling them that this is a common design in Europe and that there are many successful applications. We need to know the details of recent successful applications." SKF failed to disclose these facts to Hardie-Tynes.

70.    On September 24, 2012, in an internal SKF email, Mr. Detweiler (SKF) stated that Matlacha "is the first one to my knowledge. I will ask D. Winkel if he has any he knows of."

71.    Later that same day, Mr. Detweiler sent another internal SKF email:

Matlacha is the first to my knowledge. I asked Reimund Hurz [SKF] about this and he didn't have any since of the 1990s that were in Holland. We have all heard you telling customers, including this one, about all of the successful bridge jobs using plain bearings. Now we need to you give us a few. No double bearing jobs like Erasmus. Help!!

72.    On September 24, 2012, SKF's territory account manager responded that the only two bridges he could remember using plain bearings were hockey puck style and not GEP style. In other words, they were not similar to Matlacha at all. SKF failed to disclose these facts to Hardie-Tynes.

73.    On September 24, 2012, Mr. Greaser (SKF) again requested SKF Germany to provide a list of successful bridge projects that used spherical plain bearings as the main trunnion bearing, similar to the Matlacha design.

74. On September 24, 2012, in another internal SKF email, Mr. Detweiler acknowledged:

Much to the dismay of those attending early heavy moveable structure symposiums this concept has been

promoted by Dave Winkel [SKF employee]. In a recent letter, I asked Reimund Hurz [SKF Germany] about their plain bearing bridges in Europe and they don't have any since in the 1990's. The one they often refer to is the Erasmus bridge in Holland that has two plain bearings at the floating location: one to take axial displacement and one to take misalignment. A very expensive solution that would probably be too costly for a capitalist country like ours. We have tried to suppress this as competition against rolling bearings and we have been largely successful till now.

SKF failed to disclose these facts to Hardie-Tynes.

75.     On September 25, 2012, Reimund Hurz from SKF Germany emailed Hardie-Tynes a list with ten bridges that used SKF GEP… FS bearings. Importantly, as Mr. Hurz's email stated, "similarity with Matlacha cannot be judged."

76.     On September 26, 2012, SKF acknowledged that this was a complex problem, and although they continued to troubleshoot the bearing-related issues, a shaft turning independent of the inner ring was a problem they had never encountered prior to Matlacha.

77.     On September 28, 2012, discussing a new bridge project by E. C. Driver, Mr. Detweiler emailed his SKF colleagues "[w]ouldn't it be nice to come back right after Matlacha with another [spherical plain bearing job] where we can get everything right from the start?"

78.     On October 2, 2012, while SKF was still evaluating a proposed fix, Mr. Bonfini sent an internal SKF email that "[w]e are in the process of evaluating the pinning of the inner ring on the expansion side bearing to keep the shaft from turning in the bore of the bearing. Once we have that analyzed, then the pissing match begins regarding who pays for that, SKF or Hardie-Tynes. I suspect we will try to push that onto HT . . . I have a feeling that when all of this is resolved, there will be some financial recourse on all of these stumbling blocks and the

legal folks want to know what part SKF played in the design of this bridge."

79.     On October 4, 2012, SKF acknowledged it was not sure how much future business it would receive from Hardie-Tynes because of the problems with the SKF bearings at Matlacha.

80.     In 2012, SKF conducted approximately $1.3 million per year of sales with Hardie-Tynes. On October 4, 2012, Mr. Greaser (SKF) stated that SKF "can win this Matlacha battle, but it may cost significant long term business. Expected loss revenue will be approximately 1 million per year, unless we can successfully resolve this problem."

81.     In response to this email, Dan Donnelly with SKF wrote that "Legal would need to approve as this issue is not an SKF issue based on info supplied."

82.     On October 5, 2012, Mr. Greaser replied to Mr. Donnelly's email: "I would be careful saying that is not an SKF issue . . . *we also led the designers to believe that this is a common design currently being used in Europe.* The data supplied to me is that none have been built with this design since the early 1990s. The designers are also saying that SKF has supplied contradictory data on sliding coefficients, etc." SKF failed to disclose these facts to Hardie-Tynes.

83.     SKF had a duty to disclose certain facts to Hardie-Tynes, including that SKF did not have any experience with spherical plain bearings in applications similar to Matlacha, no recent experience with bearing configurations such as Matlacha, and the Matlacha design was not a common design in Europe with recent, successful applications.

84.     SKF's duty to disclose arose after it responded to multiple questions and multiple requests for information from both Hardie-Tynes and E. C. Driver (as set forth *supra*) by sending the February 22, 2011 email ("Good news SKF has many years experience with plain bearings in bridges in Europe"), representing to Hardie-Tynes that SKF's

radially-split design was common in Europe with many recent, successful applications on similar projects, and representing to Hardie-Tynes that SKF had the experience and qualifications to manufacture bearings that would work for this project.

85.     Even if SKF did not otherwise owe a duty to Hardie-Tynes after Hardie-Tynes (and E. C. Driver) requested information from SKF, once SKF decided to speak on February 22, 2011, it had a duty not to suppress or conceal any facts that materially qualified the facts SKF previously stated.

86.     After representing that SKF had experience with these types of bearings on similar projects and representing that this was a common design currently being used in Europe, SKF concealed and suppressed that it did not have applicable experience with bridge applications similar to Matlacha, concealed that this was not a common design in Europe, and concealed that there had not been any recent, successful applications with SKF radially-split bearings on similar projects with similar bearing configurations, despite SKF acknowledging all of this in internal emails.

87.     These concealments induced Hardie-Tynes to act, first when Hardie-Tynes purchased the SKF bearings under the belief that the radially-split bearings would work for this project. Even after September 24, 2012, when Hardie-Tynes requested SKF provide a list of bridges that utilized SKF spherical plain bearings with a design similar to Matlacha, SKF refused to disclose the truth and continued concealing SKF's true experience and the lack of any similar bearing configuration. This further concealment caused Hardie-Tynes to act by relying on SKF to lead the troubleshooting efforts with the bearings.

88.     SKF continued suppressing these material facts in an effort to retain an important, million-dollar-per-year account in Hardie-Tynes and in an attempt to develop industry-wide recognition as plain bearing experts. By suppressing the material information, SKF benefited from a continued business relationship with SKF and industry-wide recognition as spherical plain bearing experts in movable bridges.

89. Had SKF not suppressed and/or concealed the truth, Hardie-Tynes would not have used the SKF bearings, would not have relied upon SKF to supervise their installation, and would not have relied upon SKF while trouble-shooting the bearings.

90. Hardie-Tynes made the decisions to use both SKF bearings and SKF's bearing-related services, including supervision over installation and troubleshooting services, as a result of SKF's fraudulent concealment and suppression of material facts. As a result, the project was delayed 84 days. While SKF purported to troubleshoot the bearings, it continued its fraudulent suppression and SKF was in fact looking for ways to shift all blame to Hardie-Tynes. Because of SKF's fraudulent inducement and intentional suppression, Hardie-Tynes has been damaged.

WHEREFORE, Hardie-Tynes Co., Inc. hereby demands entry of judgment against SKF USA, Inc., for the full amount of damages incurred in the Hillsborough action, together with interest, court costs and attorneys' fees, and punitive damages against SKF USA, Inc. as a result of its misrepresentations and/or suppressions, and such further relief that this Court deems appropriate for the protection of Hardie-Tynes'[s] rights and interest.

(Doc. 50 at 9-27 ¶¶ 31-90 (capitalization and emphasis in original)).

APJI 18:05 describes concealment as a basis for fraud:

Plaintiff (name of plaintiff) says that (he/she/it) was harmed because defendant (name of defendant) hid or withheld important fact(s) from (him/her/it). To recover, (name of plaintiff) must prove to your reasonable satisfaction by all the evidence all of the following:

1. That (state the disputed fact(s) the trial judge has determined, if true, impose a duty to disclose on the defendant);

2. (Name of defendant) hid or withheld an important fact from (name of plaintiff);

3. (Name of plaintiff) did not know of the important fact; and,

4. Because (name of plaintiff) did not know the important fact, (name of plaintiff) (acted/did not act) and was harmed.

1 Ala. Pattern Jury Instr. Civ. 18.05 (3d ed.). Relatedly, APJI 18:08 defines an important fact as one that:

> would cause plaintiff (name of plaintiff) to (act/not act). A (fact or promise) is important if the person who (represents/makes) it knows that the person to whom the (statement/promise) is made is likely to (act/not act).

1 Ala. Pattern Jury Instr. Civ. 18.08 (3d ed.).

### 1. The verified allegations do not plausibly support a fraudulent suppression claim on the basis of a question directly posed to SKF by Hardie-Tynes.

Consistent with this Court's prior ruling on the Amend Motion, Hardie-Tynes has not plausibly established a duty to disclose on the basis of any question(s) that it posed to SKF. SKF identifies (and Hardie-Tynes offers no disagreement that there are) only three conceivable questions contained in the amended complaint: (1) Hardie-Tynes's request that SKF provide information about whether utilizing the bearing configuration being discussed was a common practice and whether using the radially-split bearings was appropriate for the Project (doc. 50 at 14 ¶ 51); (2) multiple questions posed and requests submitted by both Hardie-Tynes and E. C. Driver (before the purchase order was made) that led to the "Good news" email from

SKF dated February 22, 2011; and (3) Hardie-Tynes's post-installation request dated September 24, 2012, that SKF provide a list of projects utilizing the radially-split bearings. (Doc. 53 at 7-8).

The Court finds that the first alleged question is too generalized to establish a duty to disclose. *Cf. CNH*, 160 So. 3d at 1202 ("In *Freightliner*, we explained what type of question would be sufficiently specific to give rise to a duty to disclose when we stated that '[a] disclosing party cannot be punished for fraudulent suppression unless the questioning party articulates with reasonable clarity the particular information it desires.'" (some internal quotation marks omitted) (quoting *Freightliner*, 932 So. 2d at 893) (quoting another source)).

Here, Hardie-Tynes does indicate the alleged topic of the question with reasonable clarity, but many other aspects of such inquiry (relied upon to establish a duty to disclose) are too vague. Importantly, Hardie-Tynes does not indicate who within its company made this request, when it was made, how it was made, or who at SKF received the request.

Also absent from this section of Count Four is any allegation about a direct response from SKF to the request. This failure is critical. More specifically, without linking a response by SKF to this request, Hardie-Tynes has not plausibly pled how SKF's answer omits material information or otherwise meets the *prima facie*

requirements and definitions described under APJI 18:05 and 18:08, including how Hardie-Tynes acted (or failed to act) because of SKF's response to that inquiry and how Hardie-Tynes was damaged by it. *See Nat'l Park Bank of New York v. Louisville & N.R. Co.*, 74 So. 69, 80 (Ala. 1917) ("In this count neither the duty nor the concealment is sufficiently alleged.").

Further, the failure to identify SKF's response means that Rule 9(b)'s particularity criteria are also missing–the pleading does not reveal who within SKF made the material omission and when, the contents of the statement that included the material omission, why Hardie-Tynes was misled by the material omission, and what SKF obtained as a consequence of the fraud.

The second category of inquiry shares many of the same problems that the initial one does. Because Hardie-Tynes does not link which questions it specifically asked that resulted in the "Good news" email, it has not (and cannot) plausibly allege how the description of SKF's experience with plain bearings in Europe omitted any material information within the scope of any inquiry made by Hardie-Tynes. Also, the Court agrees with SKF that Hardie-Tynes cannot rely upon allegations of other inquiries made by E. C. Driver to establish a duty to disclose between it and SKF or to otherwise support a third-party fraudulent suppression claim under Alabama law. *See CNH*, 160 So. 3d at 1203-04 (acknowledging that party asserting fraudulent

suppression based upon a question must adduce evidence that it asked the question but, nonetheless, upholding jury verdict due to invited error); *id.* at 1204 ("By treating Ligon's and HTI's separate claims as a collective claim in its motions for a judgment as a matter of law and throughout most of the trial, CNH invited the error it alleges occurred and thus lost the right to now make the waived argument to this Court."); *cf. Swann v. Regions Bank*, 17 So. 3d 1180, 1192-93 (Ala. Civ. App. 2008) ("We also find no authority for [recognizing third-party fraudulent suppression claims against a lender for the failure to disclose its contractual relationship with an unlicensed builder] in the prior cases of this state.").

While the post-installation request from Lynn Taylor of Hardie-Tynes dated September 24, 2012, about prior projects in which SKF bearings had been used (doc. 50 at 21 ¶ 68) is more specific in terms of potentially establishing a plausible duty to disclose, the fraudulent suppression claim premised upon that duty nevertheless fails for other reasons. More specifically, the amended complaint asserts that Reimund Hurz ("Mr. Hurz") of SKF Germany responded to that inquiry via email on September 25, 2012. (Doc. 50 at 22 ¶ 75). Mr. Hurz identified "ten bridges that used SKF GEP . . . FS bearings" and expressly cautioned that "similarity with Matlacha[, *i.e.*, the Project] cannot be judged." *Id.* (emphasis added).

Hardie-Tynes has failed to identify what material information SKF omitted

from this post-installation responsive email from Mr. Hurz. For example, Hardie-Tynes does not allege that one or more of the ten bridges listed in the email used non-SKF bearings. Additionally, the September 24, 2012, request from Hardie-Tynes did not ask for examples of bridges with the same bearing configuration as the Project. In any event, Mr. Hurz clarified <u>in the same email</u> that the examples he provided were at least potentially dissimilar from the bridge design used for the Project.

Assuming that the Hurz email response did contain a material omission, this fraudulent suppression claim alternatively fails because Hardie-Tynes has not identified with any plausibility what action it took (or failed to take) in light of it. Importantly, at that point in time, the SKF bearings had already been purchased and installed according to the configuration set out in the design modifications for the Project. (Doc. 50 at 14 ¶ 42). Although Hardie-Tynes indicates that it would not have used SKF for any post-installation bearing services, it offers no plausible facts to support this allegation. For example, Hardie-Tynes does not allege that it would have contracted with another company to provide bearing-related services post-installation if SKF had disclosed more information about its lack of experience (with this particular design) in the September 24, 2012, email response.

Similarly, Hardie-Tynes has not articulated how it was proximately damaged by any inaction due to the material information that it claims was omitted from the

Hurz email. For example, Hardie-Tynes has not plausibly alleged how retaining SKF for (as opposed to removing it from) the Project post-installation caused it further damage. Put differently, fraudulent suppression is not plausibly established by Hardie-Tynes's assertion that SKF had one or more business reasons (such as continuing its commercial relationship with Hardie-Tynes and developing its reputation within the industry as a plain bearings expert) to suppress information from Hardie-Tynes. Instead, Hardie-Tynes needed but failed to allege why any alleged post-installation suppression by SKF caused Hardie-Tynes to act in a manner that caused it further harm.

> **2.** **Hardie-Tynes has established a plausible fraudulent suppression claim due to SKF's election to speak about its experience and the nature of the parties' communications that occurred prior to that voluntary statement.**

The Court, however, reaches a different conclusion concerning Hardie-Tynes's fraudulent suppression claim premised upon SKF's decision to speak through Mr. Detweiler's "Good news" email dated February 22, 2011. As set out in the amended complaint, Hardie-Tynes had concerns about the bearing configuration originally proposed by SKF. SKF subsequently submitted a new design to accommodate the radially-split outer rings before Hardie-Tynes purchased the bearings from SKF. (Doc. 50 at 14 ¶ 42).

Despite these proposed modifications, Hardie-Tynes continued to have doubts about the suitability of the bearings configuration–as it specifically applied to the functioning of the trunnion. (Doc. 50 at 15 ¶¶ 43-45, 49). Hardie-Tynes first expressed these concerns to E. C. Driver in a Request for Information ("RFI 28") dated January 25, 2011. (Doc. 50 at 15 ¶ 43). However, Hardie-Tynes also allegedly voiced these configuration concerns to SKF directly in conversations occurring in late January 2011 and February 2011. (Doc. 50 at 15 ¶¶ 44, 45). In the "Good news" email dated February 22, 2011, Mr. Detweiler assured Hardie-Tynes (and E. C. Driver who also had expressed concerns about the bearing configuration, *see, e.g.*, doc. 50 at 16 ¶¶ 47, 49) about SKF's experience with the GEP 630 FS bearings in bridges in Europe. Mr. Detweiler did not, however, disclose SKF's lack of experience using these bearings in the type of modified configuration proposed for the Project, even though the context of the alleged prior communications that Hardie-Tynes had with SKF about the Project made it clear that this was an important issue to Hardie-Tynes. As *CNH* and *Aliant* confirm, when Mr. Detweiler elected to speak for SKF on February 22, 2011, "he and [SKF] assumed the duty to make a full and fair disclosure without concealing other relevant facts within his knowledge." *CNH*, 160 So. 3d at 1203.

Neither side has pointed to Alabama authority that has dealt with a commercial

duty to disclose under a set of similarly alleged facts. In the absence of any case holding that no duty to disclose can arise under these (or comparable) facts, the Court concludes that if Mr. Detweiler knew about SKF's lack of experience with the modified bearings configuration that SKF proposed for the Project when he sent his "Good news" email,[11] then he had a duty to disclose that material information (and to refrain from communicating a half-truth) in light of the *Owen* factors set out above. Although Hardie-Tynes and SKF are both commercial entities, SKF was the party with superior knowledge about bearings and bearing configurations. Further, SKF was aware (before the bearings were purchased) that Hardie-Tynes had concerns about the bearings configuration for the Project. Given that awareness, SKF's lack of experience in using the bearings for the Project's particular configuration became a valuable fact subject to full and fair disclosure flowing from the "Good news" email. Finally, SKF has not argued that Hardie-Tynes had an opportunity to ascertain this information from another source, or that the customs of the trade would not have required SKF to disclose its lack of experience.

Bolstering this Court's conclusion that Hardie-Tynes has alleged enough to establish a duty to disclose (at the pleadings stage) is the paucity of any counter-

---

[11] Mr. Detweiler's knowledge of this fact is something that the Court anticipates the parties will develop further on summary judgment.

briefing by SKF (as described in § III.A above). Importantly, in its Dismissal Motion, SKF acknowledges (for the first time) that Alabama law recognizes that a duty to disclose can arise between businesses when one elects to speak and withholds material information. However, SKF fails to follow this concession with any substantive explanation why that type of fraudulent suppression claim is implausible here. Instead, without citing to anything, SKF (only) incorrectly asserts that this Court previously rejected such a fraud claim–it has not. Thus, Hardie-Tynes has cleared the duty-to-disclose hurdle at the Rule 12(b)(6) stage in light of SKF's decision to speak. through the pre-purchase "Good news" email.

The Court further finds that Hardie-Tynes has otherwise met the Rule 8 and Rule 9(b) requirements for this fraudulent suppression claim by alleging that Mr. Detweiler's "Good news" email induced it to purchase the SKF bearings (doc. 50 at 25 ¶ 87) in June 2011. Hardie-Tynes additionally asserts that if Mr. Detweiler had disclosed the material information about SKF's lack of experience with the proposed bearings configuration, it would not have used the SKF bearings. (Doc. 50 at 26 ¶ 89). Hardie-Tynes also maintains that it was damaged from the 84-day delay in the Project that was caused by SKF's alleged suppression and inducement to use the SKF's bearings in a configuration untested by SKF. (Doc. 50 at 26 ¶ 90). Thus, Mr. Detweiler's "Good news" email and surrounding allegations are sufficiently plausible

(in light of APJI 18.05 and 18.08) and particularized to survive a pleadings-based dismissal.

## IV.    Conclusion

SKF's Dismissal Motion is **GRANTED** in all respects except for Hardie-Tynes's fraudulent suppression claim premised upon SKF's election to speak through Mr. Detweiler's "Good news" email. Further, because the Court has denied the Dismissal Motion in part, "SKF will have 14 days to answer Count Four and the current stay of this action will be lifted on the next business day after SKF has filed its answer." (Doc. 48 at 3).

**DONE** and **ORDERED** this the 16th day of May, 2018.

_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge