FILED
2019 Dec-30 PM 04:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **HARDIE-TYNES, CO., INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:16-CV-1417-LCB** |
| | ) | |
| **SKF USA INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# DEFENDANT SKF USA INC.'S MOTION FOR SUMMARY JUDGMENT

SCOTT D. KRAVETZ, ESQ.
RICHARD D. SHANE, ESQ.
*Counsel for Defendant SKF USA Inc.*
DUANE MORRIS LLP
201 South Biscayne Boulevard, Suite 3400
Miami, Florida 33131
Telephone: (305) 960-2200
Fax: (305) 960-2201

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........................................................................ 1

II. STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS ........................................................................ 7

A. The relevant parties and contracts involved in the Project. .................. 7

B. The design of the Project and scope of work. ...................................... 9

C. HT purchases two bearings and related components from SKF to be used at the Project. ........................................................................ 9

D. Noises emanate from the vicinity of the bearings during testing of the new bridge, the issue is resolved, and the bridge opens. .......... 13

E. The substantial completion deadline and Owner's assessment of LDs. ........................................................................ 16

F. Related lawsuits in Hillsborough County Circuit Court and Florida Federal Court. ........................................................................ 18

G. AW and HT misrepresent the amount of damages incurred and assessed due to the noise issue. HT adopts these misrepresentations without question and seeks to enforce them against SKF in this lawsuit. ........................................................ 23

i. AW and HT's representation that Owner assessed $563,442 in LDs related to the bearing noise. ............................................. 23

ii. AW's $829,273 claim for damages. ....................................... 24

H. ECD pays AW $750,000 yet AW and now HT failed to account for this payment as a setoff to its damage claim against SKF. ........... 26

I. The current status of the Project and the bearings. ............................. 26

III. MEMORANDUM OF LAW ........................................................................ 27

A. HT's contractual indemnity claim is frivolous and/or otherwise not supported by fact or law. ........................................................ 27

1. Owner assessed, at most, 1 day of LDs against AW during the period of time the bearing noise issue was being remediated. HT's claim for 66 days of LDs as a result of the bearing noise is frivolous....28

2. AW and HT fail to credit ECD's $750,000 settlement payment as a reduction in the damages it seeks from SKF. ....29

3. Notwithstanding the fact that AW was paid $750,000 for this very claim, AW's claim for "costs and expenses" incurred due to the noise issue were improperly calculated at the outset. HT cannot pass-through this erroneous damage claim to SKF.......32

4. AW's attorneys' fees incurred and prejudgment interest accumulated in the prior lawsuits, like the underlying damages on which they rely, cannot be passed through to SKF. ....33

B. HT's damage claim is illusory and presumptively unripe—and must fail—because it is based on the faulty and inaccurate premise that SKF's bearings were defective....35

C. HT cannot recover LDs from SKF because HT, in its subcontract with AW, agreed to waive LDs....38

D. SKF's terms and conditions apply to and govern the parties' transaction. ....39

1. SKF's customer quotations taken as a whole, or SKF's Requote on its own, constituted the offer to HT; SKF's shipment of the bearings did not constitute the acceptance of HT's terms and conditions....40

2. HT's June 16, 2011 Purchase Order was neither an offer nor a counter-offer....42

E. HT's contractual indemnification claim fails as a matter of law because it rejected SKF's offer to defend and indemnify HT in the prior litigation. As a result, HT must show that it was *actually* liable for the underlying claim, not merely *potentially* liable, before it can attempt to seek indemnification from SKF. HT has not and cannot meet this burden....44

F. HT's common law indemnity claim fails. ........................................ 47

G. HT's fraudulent suppression claim fails. ........................................ 49

IV. CONCLUSION ........................................................................ 50

# I. INTRODUCTION

Defendant SKF USA Inc. ("**SKF**"), files this Motion for Summary Judgment as to all counts of Plaintiff Hardie-Tynes, Co., Inc.'s ("**HT**") Amended Complaint ("**Complaint**"). (Doc. 50). No genuine issues of material fact preclude entry of judgment in SKF's favor.

This lawsuit is an offshoot of two prior lawsuits involving the construction of a new bridge, and the demolition of the predecessor bridge, in Lee County, Florida. The project, which cost approximately $18 million, began in October 2010 and concluded in November 2013. Lee County was the owner ("**Owner**") of the project. Owner hired Archer Western Contractors, Ltd. ("**AW**") to serve as the general contractor for the project. AW in turn subcontracted with HT for a portion of the work and paid HT approximately $2 million to supply structural steel to the project. As part of its scope of work, HT purchased two bearings from SKF for approximately $80,000. SKF's bearings were functional from the moment they were installed and have never been removed from the project and are not defective.

HT manufactured both the trunnion shaft (which sits within the bearings) as well as the housings for the bearings. In other words, SKF provided only one of several components used in the bearing assemblies. AW hired a third party to install the bearings and did not use the specified SKF-approved grease during installation. In February 2011, before HT purchased the bearings, SKF informed HT and the

Engineer of Record ("**EOR**"), E.C. Driver & Associates, Inc. ("**ECD**"), that it would not be unusual for noises to come from the bearing assembly shortly after initial installation, and that this was a normal condition and would not affect the bearings.

During testing of the new bridge in August 2012, two noises emanated from the vicinity of the bearings due to the slippage of the components in the bearing housings. This should not have been a surprise given SKF's early notice to HT and the EOR. Over the next two and a half months, AW, ECD, Owner, HT, and SKF, worked together to investigate and troubleshoot the noises. The parties determined that the use and installation of an improper/unapproved grease (introduced by AW and/or its third-party installer) and the presence of water in the bearings and housings, among other things, caused the noises.

The parties implemented two fixes: first, the unapproved grease was purged and replaced with SKF's proprietary grease (which is the grease that SKF originally recommended and was specified by ECD); and, second, two pins were inserted between one of the bearings and the shaft that turns within it. The noises stopped and never returned.

Per the contract between Owner and AW, AW had to complete the project by September 3, 2012. Also per the contract between Owner and AW, and typical for any large scale project, Owner could assess liquidated damages ("**LDs**") against AW on a per diem basis for each day beyond the substantial completion deadline that

AW failed to substantially complete the project. Thus, absent any time extensions given to AW, if AW failed to complete the project by the September 3, 2012 deadline, then Owner could start assessing LDs against AW at the agreed upon rate of $8,537 per day beginning on September 4, 2012 and continuing each day until substantial completion was achieved. However, during the course of the project, AW was granted several time extensions that pushed back the substantial completion deadline by several months. Initially, the modified substantial completion deadline was pushed back to October 27, 2012. Subsequently, the substantial completion deadline was pushed back even further to November 5, 2012. It is undisputed that Owner did not begin assessing/imposing LDs against AW until November 6, 2012. In fact, after extensive discovery and analysis by Owner's expert in the underlying litigation between Owner, AW, and ECD, additional time extensions were given to AW and Owner ultimately did not start assessing LDs against AW until November 11, 2012. Importantly, the noise issue with the bearings was resolved as of November 12, 2012, and the new bridge opened to traffic on November 18, 2012.

Although the new bridge opened to traffic as of November 18, 2012, AW did not achieve substantial completion as of that date. AW had to complete the demolition of the predecessor bridge before the project could be deemed to be substantially complete. The demolition of the old bridge involved a significant amount of work, including the removal of underwater pilings and other components.

AW's demolition work continued throughout the 2013 calendar year. Subsequent to November 12, 2012 (the date the noise issue was resolved) and throughout 2013, Owner assessed LDs against AW due to AW's delays and inability to complete the demolition work. These delays and the associated LDs that were assessed were separate from and had nothing to do with, the bearing noise issue that had been resolved as of November 12, 2012. In the end, Owner assessed 367 days of LDs against AW in the amount of $3,133,079. Significantly, the 367 days ran from November 11, 2012 to November 13, 2012.

As a result of the significant delays caused by AW and LDs that were assessed, when AW sought final payment from Owner, Owner did not pay AW its contract balance and instead set off the LDs against monies that were due AW under the contract. Litigation then ensued between AW, Owner, and ECD. AW sued Owner for its contract balance, for monies AW claimed it was due for multiple change orders and for delay damages that AW claimed it sustained relative to the bearings. AW also sued ECD for delay damages AW claimed it sustained for the period of time it took to resolve the noise issue, asserting that ECD, as the EOR, was liable for the defective design of the bearings. In the end, when the underlying case was settled, AW took a haircut from what it was owed due to AW's delays and the LDs that were imposed. SKF was not sued in the underlying suit. At the time of the

settlement of the underlying case, HT was in the process of winding down its company. Simply stated, HT was not collectible and was going out of business.

Despite the minimum window between the revised substantial completion deadline (November 11, 2012) and the date the noise issue was resolved (November 12, 2012), AW, knowing that HT was not collectible, and in concert with HT, manufactured a claim to try to hold SKF liable for the delays *and* LDs that were assessed. Although it is clear that AW was tagged for LDs for its own delay in completing the demolition work and took a significant haircut on what it was due from the Owner, AW and HT prepared and signed documents asserting that Owner assessed LDs against AW for the bearing issue. Specifically, AW and HT signed documents stating that Owner assessed 66 days of LDs against AW for $563,442 because of the bearing noise issue. In this case, HT now seeks indemnity from SKF for the $563,442. In sum, HT is perpetrating a fraud on SKF and the Court. The undisputed facts show that Owner began assessing LDs on November 11, 2012 and further show that the bearing issue was resolved the very next day, November 12, 2012. Thus, at most, one day of LDs was assessed during the bearing delay. In addition to the $563,442, HT is seeking indemnity for $829,273 that relates to the direct and indirect costs and expenses AW claimed it sustained as a result of the delays associated with the bearing noise. Per a document entitled "Memorandum of Understanding" entered into between AW and HT and a resulting consent judgment

in favor of AW and against HT, in addition to the $563,442, AW also passed through its damage claim for direct and indirect costs to HT, and HT now seeks to pass through the $829,273 to SKF. However, AW brought this same damage claim against ECD and ECD paid AW $750,000 as part of the settlement. AW did not credit HT for the $750,000 and instead included all of the $829,273 as part of the consent judgment. If HT were to recover the $829,273 and pay same to AW, AW will receive double recovery for this damage component.

Moreover, the consent judgment, under which HT agreed to a judgment against it for $2,041,613, is illusory. HT has not paid a penny to AW and has no obligation to pay AW unless and until HT recovers the money from SKF.

Without any finding as to liability or responsibility for the cause of the noise issue, HT seeks to bypass any determination of causation (or damages incurred) and have SKF reimburse it for the $2.1 million it arbitrarily promised to AW. HT cannot pass-through to SKF any claims for which HT is not itself responsible. Moreover, SKF has no liability for LDs that were assessed for delays caused by AW that were unrelated to the bearing noise.

SKF is entitled to summary judgment on all counts of HT's Complaint. Count 1 for "breach of contractual indemnity clause" fails because SKF's terms and conditions govern the parties' transaction; the alleged indemnification provision relied on by HT arises from its own terms and conditions, which do not control.

Count 2 for "common law indemnity" fails because SKF offered to defend and indemnify HT in the prior lawsuits (which HT rejected) and there has never been a finding that SKF's bearings were defective. Count 3 for "breach of warranty" fails (a) for the same reason as Count 1 and (b) because SKF's goods were not warranted for a particular purpose. Count 4 for "fraudulent suppression" fails because SKF did not suppress information pertaining to the bearings; indeed, SKF informed HT at the outset about the possibility that noise may emanate from the bearings. Finally, HT is seeking to hold SKF liable for frivolous claims.

It is clear that HT and AW colluded and arbitrarily agreed that HT would be liable to AW for $2.1 million. If this Court were to accept HT's position, which is, essentially, that HT is entitled to a judgment of more than $2 million because it is simply written on a piece of paper signed by HT and AW, then there is nothing stopping those parties from in the future arbitrarily determining that they were damaged $100 million and seeking to extract that amount from SKF by way of an indemnity claim. Such tactics are unlawful and should be prohibited by this Court.

## II. <u>STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS</u>

### A. <u>The relevant parties and contracts involved in the Project</u>.

1. On May 18, 2010, Owner entered into a construction contract with AW for the Matlacha Bridge Replacement Project (the "**Project**"), which included the replacement of an existing 704-foot long drawbridge with a new 675-foot long

drawbridge and the demolition of the predecessor bridge. (Ex. 1 at 2, 6). The original cost for the Project was $17,806,520.45. (*Id.* at 1).

2. The original deadline date for AW to achieve substantial completion of the entire Project was September 3, 2012. (Ex. 2 at 1). During the course of the Project, AW was granted several time extensions, which pushed back the substantial completion deadline to October 27, 2012. (*Id.*).

3. The contract between Owner and AW provides for the assessment of LDs for delay in the amount of $8,537 for each calendar day that expires after the time specified for substantial completion and the Project fails to reach substantial completion. (Ex. 1 at 19).

4. On April 28, 2011, AW issued a purchase order to HT to supply structural steel, machinery, and related components for the Project. (Ex. 3). Attached to that purchase order were AW's "Terms and Conditions of Sale". (*Id.* at 5-8). "Attachment A" to the purchase order is a document that was negotiated and signed by HT modifying AW's Terms and Conditions. (*Id.* at 1). Paragraph 12 of "Attachment A" refers to Section 14 of the "Terms and Conditions of Sale" (titled "Indemnification") and strikes from that section AW's ability to recover "direct, liquidated, consequential, incidental or other damages" from HT pertaining to HT's performance under or in connection with the purchase order. (*Id.*).

5. Owner retained ECD as the Engineer of Record. (Ex. 3 at 3; Ex. 4 at 56:25-57:3; Ex. 5 at 308:22-24). ECD designed the Project. (Ex. 6 at 13:1-4).

6. SKF was not the engineer of record. (Ex. 5 at 308:19-21).

**B. The design of the Project and scope of work.**

7. The contract between Owner and AW required AW to demolish the old bridge after erection of the new, replacement bridge. (Ex. 1 at 6; Ex. 7 at 153:4-19).

8. The new bridge is a single leaf drawbridge, meaning that only one section of the bridge moves. (Ex. 8 at ¶36). The movable section is supported by structural steel that is attached to a horizontal steel shaft called a "trunnion shaft" that serves as the bridge's horizontal axis. (*Id.*). The trunnion shaft moves the single leaf by rotating inside a bearing and bearing housing. (*Id.*).

9. ECD specified two "GEP 630 FS" bearings for use at the Project. (Ex. 4 at 48:16-23). The "GEP 630 FS" model bearings are spherical plain bearings. (Ex. 9 at 95:1-9). These types of bearing are well suited for use in single leaf drawbridges such as the one erected at the Project. (Ex. 5 at 227:14-229:11, 305:1-4, 305:9-15).

**C. HT purchases two bearings and related components from SKF to be used at the Project.**

10. SKF is a manufacturer of "GEP 630 FS" bearings. (Ex. 43 at 318:3-17).

11. HT desired to order bearings from SKF to use at the Project. (Ex. 10).

12. Between 2009 and 2011, SKF issued to HT three formal "customer quotations" for bearings and related parts: (i) Customer Quotation #2009Q06077

dated October 30, 2009 ("**October 2009 Quote**") (Ex. 11); (ii) Customer Quotation #2011Q02222 dated March 28, 2011 ("**March 2011 Quote**") (Ex. 12); and (iii) Customer Quotation #2011Q03445 dated May 12, 2011 ("**May 2011 Quote**") (Ex. 13). Each quote includes the following statement in the lower right-hand corner: "Subject to standard SKF Terms and Conditions." (Ex. 11, 12, 13).

13. Subsequently, on May 23, 2011, SKF sent to HT an email with subject "Sheet with requoted prices." (Ex. 14). The email contains a one-page attachment containing "requoted prices" for two projects, one of which was the Matlacha Project ("**Requote**"). (*Id.*). SKF's Requote identifies the same exact products by product number included in SKF's October 2009 Quote with reduced prices. (Ex. 11, 14).

14. HT accepted the reduced pricing for the bearings and associated parts and, on June 21, 2011, HT sent an email to SKF that contains as an attachment a purchase order dated June 16, 2011 ("**PO**"). (Ex. 15). HT's PO states, among other things: "*REFERENCE YOUR* [SKF's] *QUOTATION OF 06/06/11*." (*Id.*). There was no SKF customer quotation dated "06/06/11." (*Id.*).

15. Upon receipt of HT's email and attached PO, SKF reviewed and acknowledged receipt of the PO by stamping the PO with SKF's standard stamp that states: "SKF USA INC. SKF TERMS AND CONDITIONS APPLY[.] PRICES ARE SUBJECT TO CHANGE BY THE SELLER AS NECESSARY TO AVOID

ANTI-DUMPING PENALTIES." (Ex. 16). SKF then returned the stamped copy of the PO to HT. (Ex. 17 at 31:3-34:21).

16. Upon receipt of any purchase order, it is SKF's standard practice to review it, ensure that the products, pricing, and delivery terms match those specified in SKF's customer quotation, and determine availability of the products. (*Id.* at 97:4-21; Ex. 9 at 105:3-107:10). If the order meets with SKF's approval, then SKF will send an acknowledgment back to the customer that it was accepted and will be fulfilled; that acknowledgement includes SKF's stamp informing the customer that SKF's terms and conditions apply to the transaction. (Ex. 9 at 105:3-107:10).

17. On August 21, 2009, SKF mailed its terms and conditions to its institutional clients, including HT. (Ex. 18). SKF's employees' signature blocks state that its terms and conditions apply to all customer orders and quotes. (*E.g.*, Ex. 19).

18. SKF's terms and conditions apply to all customer transactions, absent a written agreement to the contrary signed by both SKF and a customer. (Ex. 20 at 2). SKF's terms and conditions state in part: "DIFFERENT TERMS AND CONDITIONS AT A DIFFERENT PRICE FROM THOSE GENERALLY APPLICABLE CAN BE NEGOTIATED ON REQUEST, BUT SHALL APPLY ONLY IF SIGNED BY A PRESIDENT OR DIRECTOR OF SELLER." (*Id.*). No such written agreement to the contrary exists between SKF and HT. (Ex. 21 at ¶9).

19. SKF's terms and conditions also state:

> Products manufactured and/or sold by Seller shall, when properly installed and maintained, be fit for the ordinary purposes for which such goods are used, and shall be free of defects in material and workmanship at time of shipment. In no event shall Seller be obligated under this warranty or otherwise in any way whatsoever for normal wear and tear or for any Product which, in Seller's sole and exclusive determination, has been subjected to . . . misapplication, . . . improper installation or maintenance, . . . or otherwise caused by Buyer. . . . THERE ARE NO WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, EXCEPT OF TITLE, WHICH EXTEND BEYOND THAT EXPRESSLY STATED ABOVE IN THIS PARAGRAPH. (Ex. 20 at 3).

20. SKF's terms and conditions specifically disclaim all direct, indirect, incidental, and consequential damages:

> IN NO EVENT SHALL SELLER BE LIABLE HEREUNDER OR OTHERWISE FOR LOSS OF PROFITS, OR DIRECT, INDIRECT, SPECIAL, INCIDENTAL, OR CONSEQUENTIAL DAMAGES OF ANY KIND OR IN ANY AMOUNT, ARISING OUT OF THIS AGREEMENT OR IN CONNECTION WITH THE PRODUCTS AND RELATED SERVICES PROVIDED BY SELLER HEREUNDER, EVEN IF SELLER HAS BEEN ADVISED AS TO THE POSSIBILITY OF SUCH DAMAGES. SELLER'S TOTAL AND EXCLUSIVE LIABILITY FOR NONPERFORMANCE UNDER THIS AGREEMENT, INCLUDING NONPERFORMANCE CAUSED BY SELLER'S GROSS OR ORDINARY NEGLIGENCE, SHALL BE STRICTLY LIMITED TO THE COST OF REPLACEMENT OF THE PRODUCTS PROVIDED HEREUNDER. IN NO EVENT SHALL DAMAGES EXCEED THE AMOUNT EQUAL TO THE PRICE OF THE PRODUCTS PAID TO SELLER. . . . (Ex. 20 at 3).

21. HT had done business with and ordered items from SKF on several occasions prior to the Matlacha bridge Project. (Ex. 22 at 35:9-13). Thus, HT knew or should have known of SKF's terms and conditions. (*Id.*)

22. SKF manufactured and supplied two "GEP 630 FS" model bearings for the Project. (Ex. 5 at 301:13-15). Separately, HT manufactured and supplied the trunnion shaft and bearing housings. (Ex. 5 at 60:22-61:2; Ex. 22 at 71:12-14; Ex. 23 at 58:21-23; Ex. 24 at 235:24-236:8). The trunnion shaft sits within the bearing, and the bearing housing encases the bearing. (Ex. 5 at 301:16-302:10).

23. SKF often manufactures both the bearing and bearing housing to eliminate potential performance issues in the field and because the housing has a big influence on the bearing. (*Id.* at 290:3-291:6, 302:18-303:14). Here, HT initially thought that SKF's quote included the cost for the bearing housing. (*Id.* at 290:16-291:6). However, upon realizing that the quote was only for the bearing, HT decided not to purchase the housing from SKF and instead manufactured it themselves. (*Id.*).

24. SKF was not hired to and did not install the bearings. (*Id.* at 307:3-23).

25. ECD, HT, and AW did not rely on SKF to ensure compatibility of every component piece going into the bearing assemblies and housings. (*Id.* at 302:6-10, 309:16-310:7; Ex. 25 at 344:14-21).

26. The total cost for the bearings and associated parts purchased by HT from SKF was $87,056. (Ex. 16).

**D. <u>Noises emanate from the vicinity of the bearings during testing of the new bridge, the issue is resolved, and the bridge opens.</u>**

27. On February 22, 2011, months before HT submitted its PO to SKF for the bearings, SKF informed ECD and HT that it would not be unusual for there to

be some noise emanating from between the bearings and trunnion shaft after installation, stating: "[i]n some cases the bearing generated some noise as the [trunnion] shaft moved within the bearing bore but the noise went away after a short time." (Ex. 26 at 1).

28. The lead Project engineer from ECD, Jim Phillips ("**Phillips**"), acknowledged that the "stick slip" condition is not uncommon. (Ex. 27).

29. AW retained a third party, Seacoast Inc., to install the bearings at the Project. (Ex. 25 at 337:15-21; Ex. 28; Ex. 29 at 6:19-7:22). The bearings were installed in February 2012. (Ex. 31).

30. The bearings sat idle and unused until testing of the bridge began in August 2012. (Ex. 5 at 299:14-301:12).

31. During the initial startup and testing of the new bridge (*i.e.*, repeated opening and closing), noises were heard emanating from the vicinity of the bearings. (Ex. 30). The noise was first observed on August 21, 2012. (Ex. 32 at 157, ¶13.22). Despite the bridge's ability to open and close and full functionality, Owner did not want to open the bridge to traffic while the noises were present. (Ex. 6 at 40:6-14).

32. Owner, AW, ECD, HT, and SKF, and their respective consultants, worked together to identify the source and cause of the noises and troubleshoot a fix. (Ex. 24 at 240:16-241:16; Ex. 33 at 1-2; Ex. 34 at 1-2; Ex. 35; Ex. 36). It was determined that the causes of the noises included (a) the use of a grease that was not

specified or approved by ECD as the EOR, which caused slippage between the trunnion shaft and the bearings, and (b) the presence of water in the bearings and bearing housings. (Ex. 5 at 297:24-299:13; 326:15-328:18; Ex. 37; Ex. 32 at 156, ¶13.17; Ex. 38 at 7, ¶24; Ex. 39; Ex. 40; Ex. 80).

33. HT's present expert, who ECD used as its expert in the underlying litigation, opined that "AW assumed responsibility for supplying grease that had not been approved by the EOR [ECD]." (Ex. 38 at 17)

34. In early November 2012, the parties implemented two fixes. (Ex. 25 at 168:2-22). First, the unapproved grease was purged and replaced with a SKF proprietary, approved grease. (Ex. 41). Second, pins were installed between the bearing and trunnion shaft to prevent slippage. (Ex. 42). The noises stopped after the correct grease was introduced and the pins were installed. (Ex. 25 at 329:16-18). At no time were the bearings themselves modified or altered. (Ex. 43 at 21-24).

35. The noise issue was resolved as of November 12, 2012. (Ex. 44 at 1). Thus, the bookend dates from when the noise was first observed to when it was resolved were August 21, 2012 – November 12, 2012. (*Id.*; Ex. 32 at 157, ¶13.22).

36. There was never a determination that the bearings themselves were the root cause of the noise or that the bearings themselves were defective. (Ex. 45). During the troubleshooting process, SKF wanted to dismantle the housing to be able to access the bearing and trunnion shaft and identify potential issues and causes of

the noises. (Ex. 25 at 346:18-347:11, 372:6-14; Ex. 5 at 297:1-23). SKF was not permitted to dismantle the housing or conduct an analysis. (*Id.*).

37. All troubleshooting assistance that SKF provided was subject to the "SKF General Conditions for Technical Assistance and Advice." (Ex. 34 at 2; Ex. 46). Like SKF's terms and conditions, this also limits SKF's liability. (*Id.*).

**E. <u>The substantial completion deadline and Owner's assessment of LDs.</u>**

38. As a result of several time extensions that were given by Owner to AW, the substantial completion deadline was first extended from September 3, 2012 to October 27, 2012. (Ex. 2; Ex. 47 at 9; Ex. 6 at 30:9-17). Thereafter, additional time extensions were given to AW pushing back the substantial completion deadline to November 5, 2012. (Ex. 48 at 2). Owner could not assess LDs against AW before the substantial completion deadline. (Ex. 6 at 30:19-31:1; Ex. 49 at 11:16-23, 12:16-13:8). Initially, Owner did not begin assessing LDs against AW until November 6, 2012. (Ex. 48 at 2; Ex. 49 at 23:25-25:1, 32:14-17).

39. The new bridge opened to traffic on November 18, 2012. (Ex. 50 at 2).

40. Although the new bridge opened to traffic as of November 18, 2012, Owner and ECD concluded that AW did not achieve substantial completion as of that date. (*Id.*; Ex. 6 at 43:22-44:1)

41. AW had to complete the demolition of the old bridge before the Project could be deemed to be substantially complete. (Ex. 50 at 2; Ex. 6 at 42:16-43:12).

42. AW's demolition of the old bridge, which continued throughout the 2013 calendar year, involved a significant amount of work, including the demolition of underwater pilings and components. (Ex. 4 at 33:2-37:23; Ex. 51; Ex. 52; Ex. 53 at 30:23-25, 31:12-17).

43. Subsequent to November 12, 2012 (the date the noise issue was resolved), and throughout 2013, Owner assessed LDs against AW due to AW's delays in completing the Project. (Ex. 49 at 30:10-19; Ex. 32 at 38, n.11).

44. The delays and associated LDs that were assessed were separate from, and had nothing to do with, the bearing noise. (Ex. 23 at 89:5-90:13).

45. Ultimately, Owner removed AW from the Project on November 13, 2013. (Ex. 54; Ex. 49 at 9:6-10:8). Owner continued assessing LDs against AW through November 13, 2013 due to AW's failure to complete the demolition work. (Ex. 32 at 38, n.11). The old bridge remained open to traffic until November 18, 2012, when the new bridge opened for traffic. (Ex. 49 at 28:8-14). Thus, the demolition of the old bridge could not take place until after the new bridge was completed and opened to traffic. (Ex. 53 at 30:14-17). SKF had no role in the demolition phase of the Project; it merely supplied products to the Project. (Ex. 16).

46. As a result of the significant delays and LDs that were assessed, when AW sought final payment from Owner, Owner did not pay AW and set off the accrued LDs against AW's contract balance that it was seeking. (Ex. 57 ¶¶62-74).

47. Pursuant to Change Order No. 5, Owner back-charged AW the sum of $3,201,375 for 375 days of delay. (Ex. 55 at 2).

48. Because the noise issue was resolved as of November 12, 2012 (Ex. 44 at 1), and the LDs first commenced on November 11, 2012 (Ex. 53 at 44:17-22), at most, one day of LDs at $8,537/day could be attributable to the noise issue.

**F. <u>Related lawsuits in Hillsborough County Circuit Court and Florida Federal Court.</u>**

49. On May 22, 2014, HT filed suit against AW in Hillsborough County, Florida, seeking recovery of its retainage holdback of ten percent ($184,047.50) of the subcontract (the "**Hillsborough County action**"). (Ex. 56 at ¶20).

50. On August 18, 2014, AW filed suit against Owner and ECD in the United States District Court for the Middle District of Florida (the "**Florida federal court action**"). (Ex. 57). With respect to the claims against Owner, AW alleged it was due its contract balance that had not been paid by Owner as a result of the back-charge for LDs. (*Id.* at ¶84). AW also claimed that the Owner owed AW money for change orders resulting from extra work that AW claimed it performed. (*Id.*). AW also claimed that Owner furnished defective and unsuitable plans to AW (the bearing design) and sued Owner for its direct and indirect costs allegedly incurred in resolving the noise issue. (*Id.* at ¶¶76-79, 85-86). In total, AW claimed it was due $4,308,119.73, exclusive of interest and attorneys' fees. (*Id.* at ¶ 84).

51. With respect to its claims against ECD, AW sued ECD and the lead engineer individually (Phillips) for furnishing defective and unsuitable plans. (*Id.* at ¶¶102-106). Specifically, AW alleged that the bearing design furnished by ECD was defective and, as a result, AW incurred damages during a period of delay starting on August 21, 2012. (*Id.* at ¶¶52, 62, 102-106). The defective design claim solely pertained to the design of the bearings. (*Id.* at ¶¶102-106). The damages sought were for the same direct and indirect costs that AW sought against Owner. (*Id.* at ¶104).

52. Owner filed a counterclaim against AW for failure to "perform its work in a timely fashion resulting in delays to the Project." (Ex. 58 at 19, ¶8.1). In sum, Owner sought recovery of its LDs that were assessed. (*Id.* at 19-20, ¶10).

53. On September 4, 2014, the Hillsborough County action was abated pending resolution of the Florida federal court action. (Ex. 59).

54. In the Florida federal court action, Owner retained Stephen Bennett ("**Bennett**") as its expert. (Ex. 32 at 6).

55. After extensive discovery, analysis, and consultation between Owner and Bennett, Owner, by and through Bennett, gave AW additional days of time extensions. (Ex. 53 at 38:2-40:13; Ex. 60) As a result, in the end, Owner assessed LDs against AW for the period of November 11, 2012 through November 13, 2013—a total of 367 days. (Ex. 53 at 43:25-44:22; Ex. 32 at 38, n.11).

56. On April 5, 2016, subsequent to Bennett issuing his report, AW, Owner, and ECD entered into a "Settlement Agreement and Mutual Release" (the "**Settlement Agreement**") concerning the claims in the Florida federal court action. (Ex. 61). Pursuant to the Settlement Agreement, Owner and ECD agreed to pay $2,050,000 to AW. (*Id.* at 4). Owner contributed $1,300,000 to the settlement amount and ECD contributed $750,000. (*Id.*).

57. On June 21, 2016, pursuant to the Settlement Agreement, AW dismissed the Florida federal court action. (Ex. 62).

58. On August 11, 2016, AW filed an answer and counterclaim against HT in the Hillsborough County action. (Ex. 63). AW's counterclaim included claims for breach of contract and indemnification. (*Id.* at 4-6). AW alleged, among other things, that HT breached its contract by failing to provide AW with bearings that were free from defects, failing to provide bearing installation services that were free from defects, failing to provide bearings that were fit for the purposes intended, failing to provide bearing installation services that were fit for the purposes intended, and providing a bearing that performed abnormally. (*Id.* at ¶10).

59. On August 15, 2016, HT demanded that SKF defend and indemnify HT with respect to AW's counterclaim asserted against it in the Hillsborough County action. (Ex. 8 ¶ 18). In response, SKF offered to indemnify and defend HT under a reservation of rights. (Ex. 64 at 2-3). HT recognized that SKF offered to "provide

a defense [for HT] as to all claims related to SKF's work." *(Id.* at 2). However, HT's counsel demanded "a complete acceptance of our defense and indemnity . . . without reservation." (*Id.*). Even though SKF offered to defend and indemnify HT (albeit under a reservation of rights), HT refused to accept anything less than "an unconditional defense and indemnity to AW-Western's allegations." *(Id.* at 2-3).

60. HT's counsel also acknowledged SKF's offer to defend and indemnify HT. (Ex. 64-67). In an email dated September 19, 2016 at 10:11 a.m. from HT's counsel to SKF's counsel, HT's counsel acknowledges SKF's offer to indemnify and defend with a reservation of rights and states that HT is "not inclined to accept an indemnification with any reservations." (Ex. 68 at 3).

61. On August 29, 2016, HT filed its initial Complaint in this Court against SKF seeking to pass through and recover from SKF the damages that HT claims to owe to AW. (Doc. 1).

62. On October 5, 2016, in an effort to protect its interests in the dispute between AW and HT, SKF moved to intervene in the Hillsborough County action. (Ex. 69). On December 7, 2016, SKF noticed its motion to intervene for hearing on January 24, 2017. (Ex. 70).

63. On November 17, 2016, and without notice to SKF, AW, HT, the three individual owners of HT (the Debardeleben brothers), and Steward Machine Co.,

Inc. (owned by the Debardelebens) entered into a "Memorandum of Understanding" ("**MOU**"). (Ex. 71). The MOU begins with the following:

> <u>Liquidation of Archer Western Damages</u>. Hardie-Tynes agrees that it has no defense to Archer Western's claim that it has been damaged because of SKF's conduct and the improper functioning of two SKF bearings (GEP 630 FS) provided by SKF to Hardie-Tynes, and Hardie-Tynes to Archer Western, for the Matlacha Bridge project located in Lee County, Florida. The following elements of damage include:
>
> $563,442 – Liquidated Damages Assessed by Owner
> $829,273 – Costs and Expenses Incurred by Archer Western
> $320,020 – Attorney Fees Incurred by Archer Western in Lawsuit with Lee County, Florida and Design Professionals Relating to Bearing
> $289,524 – Prejudgment Interest (FL) as of 11/17/2016 for above elements
> $39,354 – Attorneys' Fees Incurred by Archer Western in Hardie-Tynes Lawsuit
> ==========
> $2,041,613

64. Per the MOU, HT agreed to a consent judgment against it and in favor of AW for $2,041,613. (*Id.* at 1). The MOU further delineates HT's agreement to pursue claims against SKF to attempt to recover the amount of the consent judgment. (*Id.* at 2-3). Per the MOU, AW agreed to pay for all of HT's attorneys' fees and expenses in this suit. (*Id.*). HT has no obligation to pay AW anything if HT does not recover from SKF. (*Id.*; Ex. 22 at 98:8-230). If there is any recovery from SKF, first the proceeds go back to reimburse AW for attorney's fees and if there is any surplus leftover they are to be split, 87% to AW and 13% to HT. (Ex. 71 at 2-3).

65. HT blindly accepted as true the statements in the MOU and the underlying Settlement Agreement pertaining to AW's alleged damages without independently determining whether they were actually accurate or incurred. (Ex. 22 at 97:6-10; Ex. 23 at 106:15-109:21).

66. HT agreed to a consent judgment that included consequential damages and LDs although it specifically agreed with AW that it would not have liability for those damages. (Ex. 22 at 105:5-10, 105:13-19, 106:20-111:9; Ex. 3 at 1, 7).

67. On January 23, 2017, the Hillsborough County action was dismissed per the consent judgment in favor of AW and against HT for $2,041,613. (Ex. 72). SKF's motion to intervene was never heard. (Ex. 73 at 1).

**G. <u>AW and HT misrepresent the amount of damages incurred and assessed due to the noise issue. HT adopts these misrepresentations without question and seeks to enforce them against SKF in this lawsuit.</u>**

68. HT seeks to recover from SKF the amount of the consent judgment ($2,041,613) along with its retainage, interest, and attorneys' fees incurred in the prior litigation ($307,985.83). (Ex. 71 at 1-2; Ex. 74 at 3). As of November 17, 2016, this amount totals $2,349,598.83. (Ex. 71 at 1-2; Ex. 74 at 3).

**i. AW and HT's representation that Owner assessed $563,442 in LDs related to the bearing noise.**

69. Owner first began assessing LDs against AW beginning on November 6, 2012 and through November 13, 2013. (Ex. 49 at 23:25-25:1, 32:14-17; Ex. 32 at 38, n.11). After further analysis, Owner, by and through Bennett, later pushed the start date for the assessment of LDs back to November 11, 2012 as detailed in Bennett's report dated January 18, 2016 and as confirmed by his recent deposition testimony. (Ex. 53 at 44:17-22; Ex. 32 at 38, n.11). As confirmed by Bennett, in

the end, Owner assessed 367 days of LDs against AW for the period of November 11, 2012 – November 13, 2013 for a total of $3,133,079. (Ex. 32 at 38, n.11).

70. However, the MOU and HT's interrogatory answers represent that Owner assessed 66 days of LDs related to the bearing noise issue for a total of $563,442. ($8,537/day x 66 days). (Ex. 71 at 1; Ex. 74 at 2). HT seeks to recover from SKF the $563,442 passed on to it from AW (*Id.*), even though Owner never assessed this amount against AW in the first place, and AW should have never assessed this amount against HT. (Ex. 49 at 24:20-24).

**ii. AW's $829,273 claim for damages.**

71. HT also seeks to recover $829,273 from SKF for "Costs and Expenses Incurred by AW". (Ex. 71 at 1). This specifically relates to AW's alleged direct and indirect costs associated with the noise issue. (Ex. 7 at 47:12-15; Ex. 32 at 154, ¶13.11). Even though AW initially claimed $944,052.06 in costs and expenses due to the noise issue (Ex. 75 at 2), it reduced this amount in the MOU. (Ex. 71 at 1).

72. AW's direct costs include five items that total $137,310.95. (Ex. 76 at 1). One of these costs (for $74,686.52) relates to SKF's own work in investigating the noise issue. (*Id.*; Ex. 7 at 62:7-24; Ex. 78). In connection with the extensive amount of time SKF spent investigating the noise issue and trying to resolve same, SKF submitted an invoice to AW seeking to be reimbursed for the time spent by its staff. (Ex. 77). Neither AW nor HT ever paid SKF for this work, yet HT includes

this as part of its own damage claim and seeks to recover the amount of SKF's unpaid invoice from SKF. (Ex. 7 at 62:10-24; Ex. 71 at 1; Ex. 74 at 2-3).

73. As part of the consent judgment, AW held HT responsible for indirect costs totaling $802,666, which represents an 84-day delay in completing the Project due to the noise issue minus a 10-day credit per FDOT guidelines. (Ex. 32 at 154, ¶13.11). HT seeks to recover these costs from SKF. (Ex. 71 at 1; Ex. 74 at 2-3). AW used an improper formula to calculate its indirect costs. (Ex. 32 at 12, ¶2.11).

74. The Florida Department of Transportation ("**FDOT**") specifications govern the contract between Owner and AW. (Ex. 7 at 20:7-8). Pursuant to the applicable FDOT specifications, AW would have been entitled to 74 days of delay (which includes a 10-day credit per FDOT requirements) calculated at a rate of $1,816.99 per day, which totals $134,457.26, not $802,666. (Ex. 32 at 171, ¶13.77). Instead of using the FDOT specifications, AW calculated its per diem indirect costs to be $10,846.74, which may have been appropriate if the FDOT specifications did not apply. (Ex. 53 at 56:24-57-19). At most, AW may be entitled to $134,457.26 in indirect costs. (*Id.* at 57:20-58:1). Notwithstanding its improper calculation, AW used the improper, unapproved grease and is consequently responsible for the delays and costs stemming from the noise issue. (Ex. 32 at 171, ¶13.79(1)).

75. HT further seeks to recover from SKF $359,374 in attorneys' fees that AW allegedly incurred in the prior lawsuits, which includes $320,020 in the Florida

federal court action and $39,354 in the Hillsborough County action. (Ex. 71 at 1). The supporting fee invoices produced to date do not parse out the time entries for the noise issue versus other issues. (Ex. 79).

### H. **ECD pays AW $750,000 yet AW and now HT failed to account for this payment as a setoff to its damage claim against SKF.**

76. In the Florida federal court action, AW's design claims against ECD pertained solely to the bearings used at the Project. (Ex. 57 at ¶¶ 42-45). As the EOR, ECD has no liability to pay AW for its contract balance or for change order work. (Ex. 4 at 44:24-45:25, 46:12-14). Only the Owner would have exposure for contract related claims. (*Id.* at 46:8-11). As part of the Settlement Agreement, ECD paid $750,000 to AW. (Ex. 61 at 3). Although the Settlement Agreement contained recitals stating that the Engineer "refuses and will not pay any monies to Archer for its damages relating to the Bearing Spinning/Screeching Issue," the **only** claim that AW had against ECD was solely related to the bearing. (Ex. 57 at ¶¶ 42-45). Despite the statement in the Settlement Agreement, it is clear that ECD paid $750,000 towards AW's bearing delay claim. (Ex. 4 at 132:5-133:18). HT does not account for this payment/credit as part of its indemnity claim against SKF. (Ex. 74 at 1-3).

### I. **The current status of the Project and the bearings.**

77. The bearings that SKF supplied to the Project are still in use today and have never been removed from the Project or disassembled. (Ex. 23 at 59:7-17).

78. HT admits the bearings are not defective. (Ex. 23 at 59:1-6, 86:8-16).

## III. MEMORANDUM OF LAW[1]

### A. HT's contractual indemnity claim is frivolous and/or otherwise not supported by fact or law.

As noted above, HT seeks indemnity from SKF for the following:

> Liquidation of Archer Western Damages. Hardie-Tynes agrees that it has no defense to Archer Western's claim that it has been damaged because of SKF's conduct and the improper functioning of two SKF bearings (GEP 630 FS) provided by SKF to Hardie-Tynes, and Hardie-Tynes to Archer Western, for the Matlacha Bridge project located in Lee County, Florida. The following elements of damage include:
>
> $563,442 – Liquidated Damages Assessed by Owner
> $829,273 – Costs and Expenses Incurred by Archer Western
> $320,020 – Attorney Fees Incurred by Archer Western in Lawsuit with Lee County, Florida and Design Professionals Relating to Bearing
> $289,524 – Prejudgment Interest (FL) as of 11/17/2016 for above elements
> $39,354 – Attorneys' Fees Incurred by Archer Western in Hardie-Tynes Lawsuit
> ==========
> $2,041,613

(Ex. 71). Aside from the fact that SKF has no contractual or legal indemnification obligation to HT (as discussed below), HT cannot recover these amounts from SKF because they are either frivolous and/or not supported by fact or law. The claim for $563,442 is manufactured and frivolous. With respect to the claim for $829,273, AW sued the EOR for this very claim and received $750,000 to settle this claim. Despite same, AW included this damage claim as part of the MOU and consent judgment and now HT seeks to recover same against SKF. If SKF were to pay said claim, AW would be the beneficiary of double recovery. Moreover, AW's calculation methodology for the indirect costs is significantly flawed and, to add insult to injury, HT seeks indemnity in the amount of $63,563 in relation to an SKF invoice that was **never** paid by AW. Finally, because HT's aforementioned claims

[1] SKF adopts the standard of review set forth in the Court's January 8, 2019 Memorandum Opinion and Order. (Doc. 91 at 20-22).

are infected, HT's accompanying indemnity claims for attorneys' fees and pre-judgment interest are similarly infected.

**1. Owner assessed, at most, 1 day of LDs against AW during the period of time the bearing noise issue was being remediated. HT's claim for 66 days of LDs as a result of the bearing noise is frivolous.**

SKF has established that Owner initially did not begin assessing LDs against AW until November 6, 2012, and that the noise issue was resolved on November 12, 2012.[2] Michael Jacob ("**Jacob**"), Deputy County Attorney for Lee County, was the person on behalf of Owner tasked with analyzing and determining the start date for LDs and the assessment of same. (Ex. 49 at 10:9-11:1, 42:1-10). Jacob confirmed that based on several time extensions that had been given to AW, the revised deadline to achieve substantial completion was November 5, 2012. (*Id.* at 24:13-18; Ex. 48 at 2). Jacob further confirmed the LDs first began running as of November 6, 2012. (Ex. 49 at 23:25-24:1-4).

At a later point in time after extensive discovery and analysis, Owner, by and through Bennett, provided AW with additional days of time extensions. As a result, in the end, Owner assessed a total of 367 days of LDs against AW beginning on November 11, 2012 through November 13, 2013. (Ex. 32 at 38, n.11). 99.7% of the LDs that were assessed had nothing to do with the bearing issue. Rather, they were related to AW's delays and failures in completing the demolition work for which

[2] *See The Colombia*, 197 F. 661, 665 (S.D. Ala. 1912) (upholding use of a contractual LDs provision).

SKF would have no responsibility. Owner therefore assessed one day of LDs against AW during the period of time that the noise issue was being remediated. This amounts to $8,537, not $563,442. While the noise issue may have delayed the overall completion of the Project until it was resolved on November 12, 2012, the reality is that AW was **not** assessed LDs during those 66 days. Counting backwards from November 12, 2012, the 66 days would have encompassed the period of September 8, 2012 through November 12, 2012. Jacob obliterated any notion that LDs were being assessed during the period that AW and HT contend. The assertion that AW was assessed 66 days of LDs relative to the bearing issue is patently false.

**2. <u>AW and HT fail to credit ECD's $750,000 settlement payment as a reduction in the damages it seeks from SKF.</u>**

ECD paid AW $750,000 in connection with the bearing issue. However, in the MOU and consent judgment, AW and HT fail to account for this $750,000. HT now seeks to recover from SKF for the exact claim that AW received $750,000 for. HT's failure to account for this payment as a setoff would result in an improper double recovery for HT.

Any assertion that ECD paid for something unrelated to the bearing design claim is simply not credible. In the underlying suit, AW had contractual claims against Owner for contract balance and for change order work performed. AW also asserted a claim against ECD alleging that the bearing design was defective and that AW sustained damages in the form of direct and indirect costs until the noise issue

was resolved. The only claim lodged by AW against ECD related to the bearing design. SKF is perfectly aware that, in the Settlement Agreement, language was inserted as part of the recitals to make the argument that ECD's payment of $750,000 was not related to the bearing issue. Specifically, at page 3 of the document, the fourth WHEREAS clause stated the following:

> WHEREAS, Lee County and the Engineer refuse and will not pay any monies to Archer Western for its damages relating to the Bearing Spinning/Screeching issue; (Ex. 61 at 3).

However, any reliance by AW or HT on the above mentioned WHEREAS clause is baseless. All of the parties knew the recitals were contrary to reality. Even Owner's attorney noted the recitals were self-serving and added so that AW could set up a claim against SKF in an attempt to recover monies that it was not paid by Owner due to its own failures on the Project. (Ex. 81 at 4; Ex. 6 at 78:4-80:24). Moreover, ECD's lead engineer, Phillips, confirmed that ECD would not and did not pay money to AW for any contract balance or change order work. Phillips testified:

> Q. Would E.C. Driver have any responsibility at all to pay Archer its retainage?
> A. We don't pay anything to Archer.
> Q. So if they're (AW) seeking retainage that was held back on their contract sum, that's something that Lee County is obligated to pay, correct?
> A. Yes.
> Q. E.C. Driver would not be involved in having any legal obligation to pay a contractor its retainage?
> A. Correct.
> Q. The engineer, E.C. Driver would not have any obligation whatsoever to pay the contractor its contract balance, would it?

> A. No.
> . . .
> Q. Who is responsible to pay Archer Western for change order work? Would it have been Lee County or E.C. Driver?
> A. Lee County.
> Q. Would E.C. Driver have any legal responsibility to pay Archer Western for change orders?
> A. No.

(Ex. 4 at 44:24-25, 45:2-25, 46:8-14).

Phillips' testimony is elementary. Clearly, it is fundamental that the owner of a project (*e.g*. Lee County) has the responsibility to pay its contractor for the work performed, not the engineer of record or an architect. Again, the **only** claims that AW had in the underlying litigation against Owner and ECD were for contract balance and change order work, and AW's claim for its direct and indirect costs relative to the allegation that the bearing design was defective. Because Phillips unequivocally confirmed that ECD would not and did not pay $750,000 to AW for contract balance or change order work, the **only** damage claim that ECD would have paid money to AW to settle was for AW's direct and indirect costs stemming from the bearing design claim.

HT's claim against SKF, which is based entirely on AW's claim against HT, must be reduced by the $750,000 that AW received from ECD. "Any amount recovered by the plaintiff in a pro tanto settlement thus reduces the amount owed by the remaining defendant, because there can be only one satisfaction of a claim. . . . [T]he trial court must give effect to a pro tanto settlement—reducing the damages

assessed against the remaining defendant[.]" *Morris v. Laster*, 821 So. 2d 923, 930 (Ala. 2001). AW, as the true plaintiff behind HT, must reduce its claim by the $750,000 received from ECD.

**3. Notwithstanding the fact that AW was paid $750,000 for this very claim, AW's claim for "costs and expenses" incurred due to the noise issue were improperly calculated at the outset. HT cannot pass-through this erroneous damage claim to SKF.**

As a threshold issue, none of AW's "costs and expenses" totaling $829,273 are recoverable by HT against SKF because AW caused the noise issue in the first place by using an unapproved grease, as confirmed by HT's own expert. (Ex. 38 at 17). If AW used SKF's approved, proprietary grease at the outset, which the EOR specified, then the noise issue would not likely have arisen; this is self-evident because the noise issue ceased once AW purged the improper grease and replaced it with SKF's propriety grease. Nevertheless, this portion of the claim is without basis.

As confirmed by Bennett, AW used the wrong formula in calculating its "indirect" costs (*i.e.*, delay costs for idle equipment onsite during the investigation into the noise issue) resulting in a grossly overinflated amount of alleged costs. (Ex. 32 at 12, ¶2.11).[3] AW claims an 84-day delay (August 21, 2012 to November 13, 2012) in completing the Project due to the noise issue, minus a 10-day credit per FDOT requirements. Instead of using the FDOT formula for calculating indirect

[3] AW would be hard-pressed to dispute Bennett's credibility in light of the fact that AW has retained him on multiple occasions to serve as AW's consultant subsequent to the resolution of the underlying litigation. (Ex. 53 67:2-25).

costs, which was required by the general contract and amounts to $1,816.99 per day, AW calculated its indirect costs as if the general contract was not governed by the FDOT specifications (at $10,846.74 per day). AW's calculation overinflates its indirect costs by almost six times the amount allowed permitted. When using the correct FDOT formula, AW's indirect costs total $134,457.26 (74 days x $1,816.99/day) instead of $802,666 (74 days x $10,846.74/day).

One of the "direct" costs AW includes, and for which HT seeks indemnity from SKF, is for work that SKF itself performed investigating the noise issue and HT's overhead for SKF's work, which totals $74,687. After spending a significant amount of time trying to troubleshoot the noise, SKF submitted an invoice to AW seeking to be reimbursed for its time. (Ex. 77). AW admitted it never paid SKF for this invoice, yet AW—remarkably—included this amount in the consent judgment that HT is now trying to pass through to SKF. In other words, HT is seeking to recover from SKF the cost of SKF's own work for which SKF was never paid.

AW alleges that it incurred other direct costs in investigating the noise issue and determining the appropriate fix. Again, had AW used SKF's approved, proprietary grease at the start, the noise issue would have never evolved and AW would not have incurred any direct costs.

**4. AW's attorneys' fees incurred and prejudgment interest accumulated in the prior lawsuits, like the underlying damages on which they rely, cannot be passed through to SKF.**

HT cannot pass-through to SKF AW's attorneys' fees incurred ($359,374) and prejudgment interest accumulated ($289,524) in the prior lawsuits.

First, the fee invoices produced to date do not parse out the time entries for the noise issue versus other issues. (Ex. 79). Multiple issues unrelated to the bearing issue were litigated in the underlying suit. AW should not be able to recover from HT (and now HT from SKF) any amounts incurred dealing with issues *other than* the noise issue. *See, e.g., Morrison v. Veale*, 2017 WL 6388960, *10 (M.D. Ala. Dec. 12, 2017) (criticizing plaintiff's time entries that had "no separation in billing for the different claims" and "the minimalistic description provide[d] the Court zero assistance in determining what hours apply to the [different] . . . claim[s]"); *Ford v. Navika Capital Group, LLC*, 2017 WL 1381668, *3 (S.D. Ala. Apr. 17, 2017) (denying attorneys' fees and costs because "[c]ounsel's billing records [did] not sufficiently differentiate among plaintiffs, making it unclear as to which entries relate to the seven (7) plaintiffs versus the terminated/dismissed plaintiffs").

Second, because Owner never actually assessed AW $563,442 in LDs *and* AW's costs and expenses were improperly calculated to be $829,273, it is unreasonable and improper for AW to recover attorneys' fees and prejudgment interest pertaining to these amounts. *See R.N. Kelly Cotton Merchant, Inc. v. Cox*, 323 So. 2d 426, 429 (Ala. 1976) (plaintiff cannot recover damages based on improper calculation); *Eways v. Georgia R.R. Bank*, 806 F.2d 991, 992 (11th Cir.

1986) (party cannot recover expenses not supported by evidence); *Martinez v. Star Fish & Oyster Co., Inc.*, 386 F. Supp. 560, 564 (S.D. Ala. 1974) ("[plaintiff] is entitled to no compensation from his employer for the non-existen[t] expenditures").

**B. <u>HT's damage claim is illusory and presumptively unripe—and must fail—because it is based on the faulty and inaccurate premise that SKF's bearings were defective.</u>**

The entire MOU, which describes HT's $2,349,571.83 damage claim, is based on a faulty, inaccurate, and unproven premise—that SKF's bearings were defective. Before HT is able to recover any damages from SKF, HT should have to prove that SKF's bearings were defective. HT cannot do so and has not asked this Court to make any such finding. Instead, HT asks the Court to accept as true the self-serving statements in the MOU, the Settlement Agreement, and various pleadings in the prior lawsuits.

Without any basis in fact and as contradicted by HT's deposition testimony, HT's Complaint alleges that SKF's bearings were defective. The MOU states that AW and HT incurred damages due to the improper functioning of the two SKF bearings. HT's executive vice president, Lynn Taylor, who testified that the bearings are not defective, directly contradicts these written statements:

> Q. **Were the bearings themselves, the actual bearings, were they defective in any way?**
> MR. DANIELS: Object to the form.
> A. **Not to my knowledge.**
> Q. Okay. And to your knowledge, are the same bearings that were originally installed, the same bearings that are out there today?

A. As far as I know, yes.
Q. Okay. To your knowledge, did the bearings that ended up at the site, did they ever have to get shipped back to SKF or anybody else to get remediated?
A. Not to my knowledge.
. . .
Q. **Tell me what was defective with respect to the bearing.**
MR. DANIELS: Object to -- objection.
A. **I know of nothing that was defective on the bearing.**

(Ex. 23 at 59:1-17, 86:11-16) (emphasis added).

The MOU makes clear that HT has no obligation to pay AW **anything** unless and until HT recovers from SKF. In fact, HT has not paid a penny to AW. Alabama courts have held that "damages are unrecoverable where the plaintiff has not paid or is not liable for such items." *Jones v. Crawford*, 361 So. 2d 518, 521 (Ala. 1978). HT's repayment obligation is entirely dependent on the outcome of this litigation. Any amount recovered from SKF will be an improper windfall to both HT and AW. The Supreme Court of Alabama has set forth three elements that must be me in order to succeed on an indemnification claim: (1) that the indemnitee be without fault; (2) that the indemnitor be the party responsible, or primarily liable; and (3) that the indemnitee has been required to pay out money by a judgment of a court.[4] *Allstate Ins. Co. v. Amerisure Ins. Co.*, 603 So. 2d 961, 963 (Ala. 1992).

[4] AW, as the sole payer of HT' attorneys' fees in this lawsuit, stands to gain the most if HT prevails in this lawsuit. The distribution windfall is described on page three of the MOU. (Ex. 71). AW never sued SKF and is now time-barred from doing so. Nevertheless, AW is using HT as a strawman to attempt to assert claims against SKF.

"The right to indemnity does not arise . . . until one acting as a surety satisfies his principal's obligation, or until a master or principal pays damages arising from his servant's or agent's negligent or fraudulent acts." *Ala. Kraft Co. v. Se. Ala. Gas Dist.*, 569 So. 2d 697, 700 (Ala. 1990); *see Sharp Realty & Mgmt., LLC v. Capitol Specialty Corp.*, 2012 WL 2049817, *17 (N.D. Ala. May 31, 2012) (holding that "[a]n insurer is not bound by a settlement agreement entered into by its insured, unless it agrees to it in advance"). Here, HT's right to indemnity has not arisen because HT has not satisfied its obligation to AW.

The Eleventh Circuit has held that "if a plaintiff's claimed injury depends on the resolution of other judicial proceedings, there may well be fitness concerns that render the plaintiff's claim presumptively unripe." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1291 (11th Cir. 2010). "And, more directly on point, the Eleventh Circuit has held that a claim for indemnification premised on potential liability to a third party is not justiciable under Article III." *Cross Creek Pictures, LLC v. S & S Aviation, Inc.*, 2018 WL 4255737, *3 (N.D. Ga. Sept. 5, 2018) (citing *Armstrong v. Alabama Power Co.*, 667 F.2d 1385 (11th Cir. 1982). The same is true in this case. No court has determined that HT is liable for any damages. The only basis for HT's argument is that it voluntarily agreed to an illusory "consent judgment" in favor of AW and against HT. Resolving a lawsuit by a consent judgment (in which HT itself has no obligation to pay) is vastly different from a

court considering the facts and law, determining liability, and entering a judgment. The facts and circumstances here dictate that HT's claims must fail. HT cannot use its "consent judgment" as a conduit to breathe legitimacy into an illegitimate claim.

The above "falls in line with decisions throughout the Eleventh Circuit holding that claims for indemnification are not justiciable until the party seeking indemnification is held liable or otherwise makes a payment." *Cross Creek Pictures*, 2018 WL 4255737, at *4; *Evanston Ins. Co. v. Dillard House*, 2017 WL 3498953, *8 (N.D. Ga. June 28, 2017) (dismissing indemnity claim for lack of subject matter jurisdiction before liability determined); *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 2011 WL 1216296, *8 (M.D. Ala. Mar. 31, 2011) ("contribution and indemnity suits brought in anticipation of liability are not ripe until the obligation to pay in the underlying separate suit has been established by a judgment or settlement").

In summary, HT cannot bypass causation and, without any determination that the bearings were defective, hold SKF responsible for damages that were not incurred because of its products. All of HT's claims fail because there has been no determination that SKF's bearings are defective and HT has admitted that the bearings are not defective. Summary judgment is warranted against HT.

### C. <u>HT cannot recover LDs from SKF because HT, in its subcontract with AW, agreed to waive LDs.</u>

Before revision, paragraph 14 of AW's terms and conditions permitted AW to recover "direct, liquidated, consequential, incidental, or other damages" from HT.

(Ex. 3). However, AW and HT agreed to modify the standard terms and conditions by striking this language. Despite having no exposure for LDs or consequential damages, HT accepted liability for those damages. Because HT has no obligation to make payment to AW absent recovery from SKF, HT did not care what it accepted liability for. Having contractually waived its obligation to pay LDs and consequential damages to AW, HT cannot now recover those damages from SKF.

Waivers and limitations of remedies are enforceable under Alabama law. *See Jim Walter Resources, Inc. v. Downard Longwall, Inc.*, 2008 WL 11380011, *2 (N.D. Ala. Feb. 27, 2008) ("Alabama law upholds provisions containing a limitation of damages; therefore, Plaintiff cannot recover special, incidental, or consequential damages.") (citing cases); *see also Puckett, Taul & Underwood, Inc. v. Schreiber Corp., Inc.*, 551 So. 2d 979, 983 (Ala. 1989) ("Commercial parties may contract freely to limit the remedies available to them."). HT's agreement to waive consequential damages and LDs is lawful. In turn, HT cannot seek to recover from SKF damages that it was not contractually obligated to pay.

### D. SKF's terms and conditions apply to and govern the parties' transaction.

HT's contractual indemnity claim (Count 1) and breach of warranty claim (Count 3) are predicated **entirely** on the faulty assumption that its terms and conditions govern the transaction. However, because SKF's terms and conditions—

to the exclusion of HT's terms and conditions—govern the parties' transaction, Counts 1 and 3 of HT's Complaint fail.

**1. SKF's customer quotations taken as a whole, or SKF's Requote on its own, constituted the offer to HT; SKF's shipment of the bearings did not constitute the acceptance of HT's terms and conditions.**

SKF's price quotation was the **offer** and HT's responsive PO was the **acceptance** that sealed the deal. SKF's first quote to HT for the bearings was the October 2009 Quote; SKF's March 2011 Quote and May 2011 Quote followed. The final communication relating to the deal was SKF's emailed Requote on May 23, 2011, which modified (rather than *replaced*)[5] the pricing in the October 2009 Quote, which expressly stated that it was "[s]ubject to standard SKF Terms and Conditions." (Ex. 11). After receiving HT's acceptance of the offer in the form of its PO, SKF—as is standard practice—stamped the PO with language reminding the contracting parties that SKF's terms and conditions apply, and sent a copy of the stamped PO to HT. (Ex. 17 at 31:3-34:21).

"[A] price quotation can amount to an offer which can be accepted." *Micor Indus., Inc. v. Mazak Corp.*, 2018 WL 804303, *6 (N.D. Ala. Feb. 9, 2018) (quoting *AEP Indus., Inc. v. Thiele Techs., Inc.*, 2016 WL 1230010, *4 (M.D. Ala. Mar. 29, 2016)); *see* 1 WILLISTON ON CONTRACTS § 4:7 (4th ed. 2007)). As such, courts

[5] The October 2009 Quote, the March 2011 Quote, and the May 2011 Quote were each new quotes intended to replace the prior, hence each quote's unique number (#2009Q06077; #2011Q02222; and #2011Q03445, respectively). The Requote, intended to *modify* rather than *replace* the prior quotes, critically **did not** bear a new, unique quote number.

applying Alabama law have found price quotations to constitute offers, as SKF urges that they did in this case. *See, e.g., Kennedy Elec. Co., Inc. v. Moore-Handley, Inc.*, 437 So. 2d 76, 81 (Ala. 1983); *Micor Indus.*, 2018 WL 804303, at *8.

Either on their own or as a whole, SKF's price quotations (or its Requote) were the offer(s) in this case. A comparison of our facts to *Jim Walter Resources, Inc. v. Downard Longwall, Inc.*, is instructive. There, the seller (Longwall) and buyer (JW) disputed whose terms and conditions applied to a commercial transaction for the purchase of construction materials. 2008 WL 11380012, at *1 (N.D. Ala. Jan. 16, 2008). Longwall started the document exchange by sending a price quote for parts JW wanted to purchase, which stated that it "and any orders resulting therefrom are subject to our standard terms and conditions." *Id.* Here, SKF's price quotations stated that they were "[s]ubject to standard SKF Terms and Conditions." (Ex. 11, 12, 13). Like HT, JW responded with a purchase order, which stated that it constituted a contract "upon the terms and conditions herein when accepted by Seller either by acknowledgement or commencement of shipment." *Jim Walter*, 2008 WL 11380012, at *2. Here, HT's PO also referenced its terms and conditions. (Ex. 15).

Like the parties here, in *Jim Walter*, "[b]oth parties' documents seem to suggest that their terms and conditions take precedence, and that the other party must asset to such terms." 2008 WL 11380012, at *6. The court found that Longwall's quote was the offer, noting that it "contained specific information regarding the

quantity, part number, price, time of delivery, and payment terms." *Id*. (citing UCC § 2-201 for the proposition that "[t]he only term which ***must*** appear is the quantity term") (emphasis added). In so ruling, the court *rejected* a number of arguments similar to those raised by HT here; for instance, the court was unpersuaded by JW's argument that Longwall's terms and conditions could not apply because they were not physically "attached to the quote," explaining that "[a] written contract may incorporate the terms of another document by reference." *Id.* at *6, n.13. This Court has recognized the same legal principle. (Doc. 91 at 29-30). Like the quote held to be the offer in *Jim Walter*, SKF's quotes issued to HT also contained specific quantity, part number, and pricing information. Also like the quote in *Jim Walter*, SKF's quotes issued to HT incorporated SKF's terms and conditions.

**2. HT's June 16, 2011 Purchase Order was neither an offer nor a counter-offer.**

In past briefing, HT has argued that its PO was actually the offer, relying on Alabama Commercial Code Section 7-2-207(1):

> A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

HT asserts that because its PO included language (inconspicuous fineprint on the reverse side of the order) that "[t]he purchase of goods or services hereunder is expressly conditioned upon Seller's assent to the terms and conditions contained or

referred to herein[,]" its PO could not have been an acceptance under the above-cited provision of Alabama law. (Doc. 97 at 2; Ex. 15). Not so. Section 2-207 was not intended to create a formalistic escape hatch or provide merchants with a "gotcha" mechanism, use of which might absolve them of their contractual agreements. *See Starbucks Corp. v. Amcor Packaging Distrib.*, 2016 WL 3543371, *9 (E.D. Cal. June 24, 2016) (explaining §2-207 "was designed to abolish" the "'last shot rule'") (quotation omitted); *Ames True Temper, Inc. v. HWA Fong Rubber (USA), Inc.*, 2012 WL 13089363, *3 (N.D. Ala. Jan. 6, 2012).

On the contrary, Section 2-207 was meant to *expand* the universe of communications qualifying as acceptances notwithstanding their different terms, not diminish it. "Section 2-207 was intended 'to alter the 'mirror' rule of common law[,]'" which required an acceptance to "mirror" the terms of the offer. *Jim Walter*, 2008 WL 11380012, at *5 (quoting *Burbic Constr. Co., Inc. v. Cement Asbestos Prods. Co.*, 409 So. 2d 1, 3 (Ala. 1982)). "This section recognizes that in commercial settings, the terms of the offer and acceptance will rarely be identical." *Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1203 (N.D. Ala. 2009).

"The conditional acceptance provision of Section 2-207(1) was intended to apply only to an acceptance which ***clearly*** reveals that the offeree is ***unwilling to proceed*** with the transaction ***unless he is assured*** of the offeror's assent to the additional or different terms therein.'" *Jim Walter*, 2008 WL 11380012, at *6

(emphasis added) (quoting, *inter alia*, *Cosden Oil & Chemical Co. v. Karl O. Helm Aktiengesellschaft*, 736 F.2d 1064, 1075 (5th Cir. 1984)). Put another way, "[t]hat the acceptance is predicated on the offeror's assent must be '***directly*** and ***distinctly*** stated or expressed[.]'" *Jim Walter*, 2008 WL 11380012, at *8 (emphasis added) (quoting *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1168 (6th Cir. 1972)).

HT's quiet inclusion of the "conditional" boilerplate print on the reverse side of its PO (Ex. 15 at 3) cannot reasonably be said to "***clearly***" or "***directly*** and ***distinctly***" demonstrate its "***unwilling[ness]***" to proceed with the purchase unless it were "assured" of SKF's assent. *Jim Walter*, 2008 WL 11380012, at **6-8.[6] HT also ignores the fact that the purchase order in *Jim Walter* explicitly provided that the seller's acceptance of the buyer's terms and conditions would be confirmed by the seller's "commencement of shipment." *See id.* at *2. Despite that provision, the court found that it was not the commencement of shipment that operated as the acceptance in the transaction; rather—as in this case—it was the purchase order. *Id.* at *6.

### E. HT's contractual indemnification claim fails as a matter of law because it rejected SKF's offer to defend and indemnify HT in the prior litigation. As a result, HT must show that it was *actually* liable for the underlying claim, not merely *potentially* liable, before it can attempt to seek indemnification from SKF. HT has not and cannot meet this burden.

[6] In fact, in HT's transmittal of the PO, its agent did not make any mention of HT's own terms and conditions, let alone did she seek assurances of SKF's assent to such unmentioned terms and conditions or manifest any "unwilling[ness]" to proceed in the absence of such assent. (Ex. 15 at 4). Rather, in submitting the PO, HT merely noted the attached purchase order and thanked the recipient. (*Id.*). In comparison, SKF's emails—internal and external, including between SKF and HT, make—explicit reference to SKF's terms and conditions, including that they "APPLY TO ALL CUSTOMER ORDERS AND QUOTES." (Ex. 11, 12, 13).

Even if HT's terms and conditions apply, which they do not, SKF's offer to defend and indemnify HT in the underlying lawsuit (with a reservation of rights) satisfied its obligations under HT's terms and conditions. HT rejected SKF's offer at its peril and demanded an "unconditional acceptance of [its] demand for defense and indemnity." (Ex. 64 at 2-3). Having rejected SKF's offer, HT cannot *now* seek contractual indemnity from SKF for its voluntary settlement in the prior actions.

SKF's attempt to indemnify and defend HT is also highlighted by the fact that SKF filed a motion to intervene in the Hillsborough lawsuit. (Ex. 69). SKF filed that motion to protect its interests against any future settlement or judgment against HT as its indemnitee. (*Id.* at 3). The parties to that lawsuit settled it without SKF's involvement the day before the hearing on SKF's motion (Ex. 61), depriving SKF of the opportunity to defend or settle the action on behalf of HT.

Alabama law supports the entry of summary judgment in favor of SKF on HT's contractual indemnity claim. In *Stone Building Co. v. Star Electrical Contractors, Inc.*, 796 So. 2d 1076 (Ala. 2000), the court found that the indemnitor rebuffed the indemnitee's demands for indemnification and ignored the indemnitee's offer to participate in negotiations that led to a settlement agreement. *Id.* at 1090-91. Here, unlike in *Stone*, SKF did not rebuff HT's demand for indemnification; to the contrary, the record shows that SKF offered to defend and indemnify HT—and HT rejected the offer. SKF was also not given the option to participate in settlement

or defend HT against the original claim. These facts are fatal to HT's claim for contractual indemnity against SKF under *Stone*, which held that:

> In the event that an indemnitor is not afforded the alternative of participating in a settlement or conducting the defense against the original claim, an indemnitee settling the claim will have the burden of establishing actual liability to the original plaintiff rather than the lesser burden of showing potential liability. However, when the indemnitor has notice of the claim and refuses to defend, the indemnitor is bound by any good faith reasonable settlement, and the indemnitee need only show potential liability.

*Id.* at 1090; *see Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co.*, 480 F.3d 1254, 1259-60 (11th Cir. 2007) ("An insurer that wishes to deny coverage thus has two choices. It may participate in the settlement pursuant to a reservation of rights, preserving the opportunity to later dispute coverage. Or it may refuse to participate, and become bound by any reasonable and good faith settlement of a claim that a court later determines falls under the policy's coverage.") (applying Alabama law).[7]

*Stone* instructs that HT, as the "indemnitee settling the claim," has the "burden of establishing **actual liability** to the original plaintiff rather than the lesser burden of showing **potential liability**." 796 So. 2d at 1090 (emphasis added); *see Gab Bus. Servs., Inc. v. Syndicate 627*, 809 F.2d 755, 760 (11th Cir. 1987) ("when the indemnitee has not given the indemnitor an opportunity to review, pass upon, or

[7] SKF's offer to indemnify and defend HT under a reservation of rights was adequate as a matter of law. *See, e.g., EmbroidMe.com, Inc. v. Travelers Prop. Cas. Co. of Am.*, 845 F.3d 1099 (11th Cir. 2017) (noting that under Florida law, "[a]n insurer does not breach its duty to defend by offering to defend under a reservation of rights"); *Cont'l Cas. Co. v. City of Jacksonville*, 283 F. App'x 686, 690 (11th Cir. 2008) (same).

participate in the settlement, due process and 'equitable indemnity principles' compel a demonstration of actual as opposed to potential liability"). Thus, HT must show that it was **actually** liable for the underlying claim because it rejected SKF's offer to indemnify and defend. Again, HT has not and cannot meet this burden and, thus, SKF is not bound by HT's settlement with AW. Without a showing that HT was **actually** liable for the claims, HT is not entitled to indemnity from SKF. Summary judgment in SKF's favor is warranted.

**F. <u>HT's common law indemnity claim fails.</u>**

HT's common law indemnity claim (Count 2) fails for several reasons. First, HT presumably pled a common law indemnity claim in the alternative to contractual indemnity (Count 1) in the event the Court finds that HT's terms and conditions do not control the parties' transaction. If the Court finds that HT's terms and conditions do not control and that SKF's terms and conditions control, then HT's common law indemnity claim **must** fail because SKF's terms and conditions limit recovery "to the cost of replacement of the products" purchased from SKF. (Ex. 20 ¶ 13).

Second, HT's common law indemnity claim fails because there has been no determination that SKF is ultimately liable. *See Travelers Indem. Co. v. Firestone Tire & Rubber Co.*, 360 F. Supp. 1328, 1330 (S.D. Ala. 1973) (dismissing a plaintiff-insurance company's common law indemnity claim because there was no determination in an underlying lawsuit that the manufacturer was liable). *Travelers*

relied on *U.S. Fire Ins. Co. v. Chrysler Motors Corp.*, 505 P. 2d 1137 (Or. 1973), where an intermediate seller and a manufacturer were co-defendants in a products liability case. The case settled before trial; the intermediate seller's insured then sued the manufacturer to recover the costs of defending the original suit. *Id.* at 1139. The court rejected the insurer's claim, finding that "[the insurer] can recover only by pleading and proving that both [the intermediate seller] and [the manufacturer] were liable to [the injured party] and that, as between [the manufacturer] and [the intermediate seller], [the manufacturer] ought to pay." *Id.* The insurer could not simply rely on allegations that, if proven, might have shown that the manufacturer was primarily liable. *Id.* The court's finding is instructive here:

> We have found no authority which would permit [the intermediate seller] to recover its defense costs without at least a showing that some act or breach of duty by [the manufacturer] was the cause of the litigation and thus of the costs incurred in [the intermediate seller's] defense. In the present case, plaintiff has not proved either its right to common law indemnity or that its involvement in the [underlying] litigation was caused by any breach of duty by [the manufacturer]. Plaintiff has not proved that the car was, in fact, defective as [the underlying plaintiff] alleged, or that if there was a defect it was one for which [the manufacturer] was responsible. Plaintiff's evidence is insufficient to support recovery on any theory, and the judgment of the trial court must be reversed.

*Id.* at 1143. Here, HT settled the prior litigation without a trial or the benefit of any judicial findings. HT did not "plead and prove" that SKF was liable and "ought to pay." *Id.* at 1139. HT cannot simply rely on allegations that, **if** proven, **might** have shown SKF to be primarily liable. *Id.* Because HT has not proved that SKF's goods

and services were in fact defective—and instead simply asks the Court to assume those allegations to be true—there is no evidence to support recovery in HT's favor on any theory, including common law indemnity.

## G. HT's fraudulent suppression claim fails.

This Court, echoing Alabama law, has recognized the consideration given to the degree to which a party claiming to be the victim of "fraudulent suppression" or a failure to disclose could have obtained the information from another source. *See* Doc. 57, Order at 40 ("SKF has not argued that HT had an opportunity to ascertain this information from another source"); *Shades Ridge Hold. Co., Inc. v. Cobbs, Allen & Hall Mortg. Co., Inc.*, 390 So. 2d 601, 616 (Ala. 1980) (describing an adequately plead claim of fraud "where the defendant has special knowledge or means of knowledge ***not open to the plaintiff***") (emphasis added).[8]

SKF did not conceal or suppress the fact that some noise could emanate from the vicinity of the bearings once installed. In fact, SKF told this directly to HT and ECD in a February 22, 2011 email. (Ex. 26). HT cannot ignore the reality that it was informed about the possibility of the noise issue. *See Standifer v. Best Buy*

[8] In fact, this variable is given consideration in jurisdictions across the country. *See, e.g., Avedisian v. Mercedes-Benz USA, LLC*, 43 F. Supp. 3d 1071, 1080 (C.D. Cal. 2014) ("a duty to disclose may [] arise when a defendant possesses or exerts control over material facts not readily available to the plaintiff"); *Waldridge v. Homeservices of Kentucky, Inc.*, 384 S.W. 3d 165, 171 (Ky. Ct. App. 2011) ("A caveat to the necessary elements under [fraudulent misrepresentation] is that "mere silence does not constitute fraud where it relates to facts open to common observation or discoverable by the exercise of ordinary diligence, or where means of information are as accessible to one party as to the other."); *Congress Fin. Corp. v. John Morrell & Co.*, 790 F.Supp. 459, 472 (S.D.N.Y. 1992) ("a duty to disclose material facts arises . . . where one party possesses superior knowledge, not readily available to the other, and knows that the other party is acting on the basis of mistaken knowledge[.]").

*Stores, L.P.*, 364 F. Supp. 3d 1286, 1302 (N.D. Ala. 2019) (granting summary judgment on a fraudulent suppression claim where the defendant sent the plaintiff an email and thus "was not silent" about information). Moreover, once AW used the SKF approved grease, the noises did in fact cease as SKF said they would. For these reasons, HT's fraudulent suppression claim must fail.

## IV. CONCLUSION

HT's lawsuit against SKF relies on concocted damages assessments, an illusory agreement to pay AW, and the faulty and unproven premise that SKF's bearings were defective. SKF's terms and conditions govern and SKF has no contractual or common law indemnification obligation to HT. HT's claim is a transparent attempt to pass-through damages to SKF that were not incurred and for which HT was not responsible in the first place.

Summary judgment in favor of SKF and against HT is appropriate because there remain no disputed issues of material fact. For the foregoing reasons, SKF respectfully requests that this Court (i) grant SKF's Motion for Summary Judgment, (ii) enter final summary judgment in favor of SKF and against HT as to all counts of HT's Amended Complaint, (iii) award SKF its attorneys' fees and costs incurred in defense of this lawsuit, and (iv) grant SKF such other and further relief as the Court deems just, equitable, and proper.

Respectfully submitted,

*/s/ Scott D. Kravetz*

Scott D. Kravetz, Esq.
Florida Bar Number: 842036
Email: sdkravetz@duanemorris.com
Richard D. Shane, Esq.
Florida Bar Number: 70611
Email: rdshane@duanemorris.com
*Counsel for Defendant SKF USA Inc.*
DUANE MORRIS LLP
201 South Biscayne Boulevard, Suite 3400
Miami, Florida 33131
Telephone: (305) 960-2200
Fax: (305) 960-2201

-and-

Michael R. Lunsford
Email: mrl@phm-law.com
*Co-Counsel for Defendant SKF USA Inc.*
PORTERFIELD, HARPER, MILLS,
MOTLOW & IRELAND, P.A.
22 Inverness Center Parkway, Suite 600
Birmingham, Alabama 35242
Telephone: (205) 980-5000
Fax: (205) 980-5001

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 30th day of December, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system, which will send notification of such filing to the following:

C. William Daniels, Jr., Esq.
bdaniels@burr.com
Matthew R. Griffith, Esq.
mgriffith@burr.com
L. Robert Shreve, Esq.
rshreve@burr.com
BURR & FORMAN LLP
Post Office Box 2287
Mobile, Alabama 36652
*Counsel for Plaintiff*

*/s/ Richard D. Shane*
Richard D. Shane, Esq.