UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| HARDIE-TYNES CO., INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 2:16-cv-1417-LCB |
| | ) |
| SKF USA, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OF DECISION

This case involves a dispute over the construction of a drawbridge in Florida. Several previous orders from the undersigned and judges previously assigned to this case have laid out the facts in great detail. Thus, it is not necessary to restate those facts in their entirety; a brief summary will suffice. The short of it is that Plaintiff Hardie-Tynes, Inc. ("HT") purchased bearings from Defendant SKF, Inc. ("SKF"), which were to be used in the in the bridge's construction. The project wasn't completed on time, and HT blames SKF's bearings.

**I. Findings of Fact Pursuant to Fed. R. Civ. P. 52(a)**

   **a. Undisputed Background Facts**

In 2010, Lee County, Florida entered into a general construction contract with Archer Western Contractors Ltd., Inc., ("Archer Western"), for a project known as the Matlacha Bridge Replacement ("the Project"). Archer Western was the general

contractor on the project, and E.C. Driver & Associates, Inc. ("E.C. Driver") designed the Project and served as engineer of record. Archer Western entered into a subcontract with HT, whereby HT was to supply the structural steel and machinery for the Project. HT then entered into a subcontract with SKF in which SKF was to supply two bearings that were involved in the raising and lowering of the bridge.

It is undisputed that the Project was not completed on time based in part on a noise that came from the bridge when it was raised and lowered. The parties disagree about the exact cause of the noise, but HT blames it on SKF's bearings.

The delay in completing the Project potentially triggered a liquidated damages provision in the contract between Archer Western and Lee County. This set off a wave of litigation beginning with a lawsuit in Hillsborough County, Florida in which HT sought recovery of its retainage holdback from Archer Western. Archer Western filed a counterclaim in that case for breach of contract and indemnification. According to Archer Western, HT breached its contract by, among other things, failing to provide SKF bearings that were free from defects; failing to provide SKF installation services that were free from defects; failing to provide SKF bearings that were fit for the purposes intended; failing to provide SKF installation services that were fit for the purposes intended; and providing an SKF bearing that performed abnormally. That case was followed by a suit in the United States District Court for the Middle District of Florida between Archer Western (as plaintiff) and Lee County

and its engineers(as defendants). That action settled in 2016. Afterwards, HT and Archer Western settled Archer Western's counterclaim in the Hillsborough County Action. The financial liability for these settlements is at the heart of the present litigation.

HT has asserted four claims in the present case stemming from its purchase of SKF's bearings: (1) breach of a contractual indemnity clause; (2) common law indemnity; (3) breach of warranty; and (4) fraudulent suppression. In order to complete the purchase and sale of the bearings at issue, HT and SKF traded numerous items of correspondence including emails, price quotes, and purchase orders. Each company had a set of standard terms and conditions that it sought to apply to the transaction. Unsurprisingly, HT's terms and conditions are quite favorable to HT, and SKF's terms and conditions are quite favorable to SKF. As noted in the most recent summary judgment order (Doc. 160), a determination of whose terms and conditions apply will dictate the remainder of these proceedings.

Deciding whose terms and conditions applied in HT's and SKF's transaction has proved to be a difficult undertaking. Being unable to discern the answer at summary judgment, the Court conducted a bench trial[1] from March 1, to March 2,

---

[1] As noted in an order entered on January 21, 2021, the Court has trifurcated the trial of this matter to conserve the parties' and the Court's resources . (Doc. 171). The Court's rulings in each phase of the trial will determine whether the next phase is necessary and, if so, the burden of proof. *Id*.

2021, to answer that question. Among other things, the Court sought testimony regarding the course of performance or course of dealing between HT and SKF in order to clarify each party's intent surrounding the transaction at issue.

### b. Trial Testimony

The testimony at trial confirmed the basic chain of events recounted at summary judgment. In 2009, HT reached out to SKF to request a quote for the bearings it intended to use in the Matlacha Bridge project. (R. 289-90). SKF responded with a price quotation on October 30, 2009, identifying the part number, quantity, price, lead time, an expiration date, and other information regarding the manufacturing of the bearings. (SKF Ex. 8). This price quotation was printed on a standardized form bearing SKF's logo and other information including the following language in the bottom right-hand corner: "Subject to standard SKF Terms and Conditions." Although those terms and conditions were not printed anywhere on the quote, SKF's employee Paul Chang testified that SKF mailed hard copies of its terms and conditions to all of its customers, including HT, in 2007 and 2009.[2] However, SKF does not deny that the October 2009 price quotation expired by its own terms on December 4, 2009. (SKF Ex. 8).

---

[2] SKF alleged in prior pleadings that its terms and conditions were available on its website. However, that evidence was not developed at trial.

Subsequent to that price quote, the parties continued their negotiations through SKF's employee Brian Hass and HT's employee Lynn Taylor. Those negotiations resulted in an email that was sent from Mr. Hass to Mr. Taylor on May 23, 2011, which stated: "Attached you will find a requote on Matlacha and South Park."[3] (SKF Ex. 14). Attached to the email was a spreadsheet containing information for parts relating the Matlacha project and the unrelated project. The information relating to the Matlacha project contained the same part number referenced in the October 2009 quote with the original price from that quote along with a "requote" of a reduced price for each part. *Id.* at p. 2. The "requote" is contained in an email and does not appear on the same type of standardized form as the October 2009 quote. Additionally, aside from the part number and price, the requote does not contain any of the other information that was contained in the October 2009 quote such as the lead time for building the bearings or the language purporting to impose SKF's terms and conditions on the transaction. However, SKF has argued that the May 2011 email was intended incorporate by reference the October 2009 quote and everything in it. Except, of course, for the December 4, 2009 expiration date. According to SKF, this email, which purports to incorporate

---

[3] Testimony at trial revealed that "South Park" referred to another project that is not related to this case.

SKF's terms and conditions from the October 2009 price quote, constitutes the offer in this case that HT accepted when it purchased the bearings.

At summary judgment, the Court noted that there were disputed factual issues regarding whether the May 2011 email revived the October 2009 quote including its language purporting to impose SKF's terms and conditions. The Court pointed to the deposition testimony of SKF employee Joanne Rompilla. There, Ms. Rompilla stated that expired price quotations like the October 2009 quote "may be null and void." (Doc. 160, at 10). However, the Court believed that her testimony left open the possibility that there may be certain circumstances where expired quotes could be revived. *Id.*, quoting (Doc. 138-1 at 6). The Court believed "that further testimony about the course of performance or course of dealing between HT and SKF could be helpful in resolving" the issue of whether the May 2011 email revived the October 2009 price quote. (Doc. 160 at10).

Ms. Rompilla testified at trial about her employment with SKF and *specifically* about her dealings with HT as they related to the Matlacha Bridge project. She was asked a series of questions about the various price quotes that were exchanged between HT and SKF between October 2009 and May 2011. (R. 299-307). Ms. Rompilla testified that at least two of the quotes, the aforementioned October 30, 2009 quote and another quote from March of 2011, contained language referencing SKF's terms and conditions. However, while appearing to acknowledge

that the May 23, 2011 email from Brian Hass to Lynn Taylor did not contain that language, she opined that it "definitely relate[ed] back to the October 30th quote" because it contained the same part numbers and the original price. (R. 306-307). Ms. Rompilla also acknowledged that the October 30, 2009 price quote was long expired at the time of the May 23, 2011 email. When asked whether it would "be unusual for SKF and for [her] to refresh and act on expired quotes[,]" Rompilla replied, "Yes. Especially when it comes to bridge projects and bridge jobs, due to the fact that they could take anywhere from six months to six years to come into play." (R. 307). Thus, Ms. Rompilla acknowledged that it would not be part of SKF's ordinary course of dealing to renew expired price quotes that it sent to customers like HT.

In an effort to rehabilitate her answer, SKF's counsel clarified his question, and asked, "In other words, the original quote expired. And so, my question is: On bridge projects, would SKF have honored and renewed expired quotes?" (R. 308). Rompilla replied affirmatively, and counsel for SKF moved on. *Id.* This was precisely the type of course-of-dealing testimony the Court was looking for. The Court interprets Rompilla's answer to counsel's follow-up question to mean that it was possible for SKF to renew an expired price quotation. However, the Court finds that her follow-up answer did not negate her previous statement that such an occurrence would be unusual on large projects like the Matlacha Bridge. There was

7

no other evidence regarding the parties' course of performance or course of dealing as it related to reviving price quotations. Accordingly, the Court finds that it was not part of the course of dealing between HT and SKF for the parties to use emails, like the one sent by Mr. Hass on May 23, 2011, to fully revive expired price quotations and all of the terms contained therein. Therefore, the Court finds that SKF's terms and conditions do not control.

But this does not end the matter. As noted, HT seeks to impose its terms and conditions on SKF because, it says, a copy of those terms and conditions appears on the reverse side of its standard purchase orders including the purchase orders sent to SKF in connection with the bearings at issue in this case. Testimony at trial revealed that HT purchase orders are typically printed on a preformatted form that contains the HT logo at the top and the HT terms and conditions on the reverse side. (*See e.g.* R. 176-77). However, there are also "electronic versions" of the purchase orders that contain only the relevant information for the parts being ordered, i.e., they are missing the HT logo and any reference to or inclusion of the terms and conditions.

During her testimony at trial, Ms. Rompilla acknowledged that, at her 2019 deposition, she identified HT Exhibit 16 as the operative purchase order. That exhibit was printed on the preformatted paper and contained HT's terms and conditions. However, Rompilla candidly admitted that she was changing her testimony at trial because, she said, she misidentified the document at her deposition.

Rompilla explained that after her deposition she "had time to go back and pull everything from the file to review it, and [she] found the 'copy of the original, do not duplicate' from Wayne Jones that superseded the original one that came in, in June." (R. 316).  Thus, Ms. Rompilla identified SKF Exhibit 18 as the operative purchase order at trial.  That exhibit appears to be an electronic copy of a HT purchase order that does not reference HT's terms and conditions.

Ms. Rompilla further explained that she was sure that SKF Exhibit 18 was the operative purchase order because the amount of the purchase order was $87,056.  According to Rompilla, SKF's accounting records showed that HT paid them that amount for the Matlacha Bridge project.  In contrast, the purchase order she identified in her deposition, HT Exhibit 16, was for $80,588.  The Court has no doubt that Ms. Rompilla saw HT Exhibit 16 while working on this project because she admitted that the purchase order had her handwriting on it.

HT did not dispute that it paid $87,056 to SKF in connection with the project at issue.  It also introduced HT Exhibit 18, a revised purchase order in the amount of $87,056, that was printed on the preformatted paper containing the HT logo and the HT terms and conditions on the reverse side.  However, Rompilla claimed to have never seen that version of the purchase order, and SKF pointed out that it had only been produced shortly before trial.  According to HT, its president, Charles Debardeleben, discovered that purchase order while going through documents

9

contained in a shipping container. Counsel for SKF had been given the opportunity to search through that same shipping container but apparently either did not find that document or chose not to copy it. The Court also notes that there was some confusion about the production of SKF Exhibit 22, an electronic copy of the $87,056 purchase order that appeared to be hand stamped with a notation stating that SKF's terms and conditions apply. Based on the confusion surrounding the production of these documents, the Court does not find them credible. However, even if it did find them credible, neither of those documents help answer the question left after summary judgment: whether the parties' course of performance or course of dealing clarified their intent with regard to whose terms and conditions controlled.

Thus, the Court is left with the following situation: SKF attempted to impose its terms and conditions by mailing them to its customers. However, there was no evidence that HT ever received and read these mass mailings. And the Court is not persuaded by SKF's position that a party can impose its terms on everyone with whom it does business simply by sending out an annual mailer. SKF's position that its terms and conditions were operative in this transaction because they were referenced in its various price quotes is also unavailing. In fact, the final price quote in this case was an email that did not contain the relevant language referencing the terms and conditions.

HT attempted to impose its terms and conditions by printing them on the reverse side of its preformatted purchase orders that were sent to vendors like SKF. However, HT also had a practice of sending electronic versions of its purchase orders that did not contain that language. There was no evidence of a course of dealing indicating that only the HT purchase orders printed on the preformatted forms were to be considered operative.

Accordingly, the Court does not find itself in any better position after two days of testimony than it did at the summary judgment stage. The Court has no doubt that HT employees like Mr. Taylor saw the phrase "SKF terms and conditions apply" on the price quotes that were sent to HT during the course of these dealings. The Court also has no doubt that SKF employees, like Ms. Rompilla, saw the HT terms and conditions on at least one purchase order, HT Exhibit 16, even if that purchase order was superseded by a revised purchase order of some type. Thus, both sides had cause to be aware that the other had their own terms and conditions that they sought to impose. However, there was no testimony or other evidence indicating that either side ever attempted to reconcile those terms in their dealings or otherwise reach any agreement as to what those terms would be. In fact, the terms are irreconcilable. For example, SKF's terms and conditions state that SKF was "prepared to accept the order only if you agree to [all of SKF's terms]." SKF's terms further state that SKF "regard[s] any order that you send to us as a document that

identifies only the products and services you are ordering from us and not as a document that adds to or modifies these terms and conditions. All other terms and conditions in your order are expressly rejected." (SKF Ex. 1). SKF's terms go on to provide that its terms can be negotiated, but only if signed by certain authorized individuals. *Id.*

Similarly, HT's terms and conditions state that "[T]he purchase of goods or services hereunder is expressly conditioned upon Seller's assent to the Terms and Conditions contained or referred to herein." (HT. Ex. 16). Further, HT's terms state that "[a]ny shipment or delivery by Seller of goods or provisions of services purchased hereunder constitutes acceptance of these terms and conditions." *Id.* The remaining terms and conditions are also polar opposites. For example, HT's terms and conditions call for extensive warranty obligations while SKF's terms and conditions disclaim all such obligations. Thus, both cannot apply.

There was no evidence of any course of dealing between the parties that would suggest one side's terms and conditions controlled over the other's. In fact, there was ample testimony at trial indicating that neither party ever raised any objection to the other party's terms and conditions. The evidence showed that HT and SKF had done business with each other since at least 2001 and had engaged in as many as 22 transactions on various projects over the years. Throughout that time, neither party appeared to question whose terms and conditions would control in the event of

a dispute like the one in this case. The only negotiations involved the "dickered terms" like the price, quantity, and various other terms that related to the specific transaction at hand. Had the parties wished to clarify their obligations on matters like warranties, indemnification, and damages, they had many opportunities to do so over the years.

The Court finds that the trading back and forth of price quotes and purchase orders, some referencing terms and conditions and some not, was insufficient to bind either party. In denying summary judgment, the Court found "that other questions of fact exist[ed] regarding the parties' extensive dealings with each other and what they may or may not have understood to govern their dealings. Evidence about the course of performance or course of dealing between the parties could clarify their intent." Having heard the testimony at trial and reviewed the evidence that was admitted, the Court does not find persuasive evidence of any such course of dealing or course of performance.

It is well settled that under Alabama law[4], "[n]o contract can be formed without an offer, acceptance, consideration, and mutual assent to the terms essential

---

[4] As noted in the Court's memorandum opinion denying summary judgment, the Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. (Doc. 160, p. 1-2). In diversity cases, courts apply the substantive law of the forum state. *Cadle v. GEICO Gen. Ins. Co.*, 838 F.3d 1113, 1121 (11th Cir. 2016), citing *Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009). HT filed this lawsuit in the Northern District of Alabama, and SKF has never challenged venue.

to the contract." *Ex parte Holland Mfg. Co.*, 689 So. 2d 65, 66 (Ala. 1996), citing *Steiger v. Huntsville City Board of Education*, 653 So. 2d 975 (Ala.1995). For the reasons stated above, the Court finds that there was no mutual assent to either party's terms and conditions. Thus, no contract was formed with respect to those terms and conditions.

## II. Conclusions of Law Pursuant to Fed. R. Civ. P. 52(a)

As noted above, HT alleged the following causes of action in its complaint: (1) breach of a contractual indemnity clause; (2) common law indemnity; (3) breach of warranty; and (4) fraudulent suppression. (Doc. 50). Because the Court finds that no contract was formed with respect to the terms and conditions of the parties' dealings, HT's breach of contractual indemnity and breach of warranty claim must fail as both rely on the existence of such a contract. Accordingly, judgement is due to be entered in favor of SKF as to Count I and Count III of the amended complaint.

The Court will set a status conference by separate order to discuss the remainder of the proceedings.

**DONE** and **ORDERED** July 21, 2021.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE