FILED
2022 Dec-27  PM 03:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **HARDIE-TYNES CO., INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  2:16-cv-1417-LCB** |
| | ) | |
| **SKF USA, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OF DECISION</u>

This case involves a dispute surrounding the construction of the Matlacha Bridge in Lee County, Florida.  Prior orders of the Court laid out this case's factual background in great detail.  Thus, the Court will not devote substantial time to a recitation of those background facts but will reference them when necessary.  The trial was split into three phases with the goal of conserving the time and resources of the Court and the parties.  As more fully discussed in previous orders and filings, *see, e.g.*, (Docs. 166 and 171), Phase I of the trial was held to determine whose terms and conditions applied to the underlying transaction.  The resolution of Phase I was to determine whether Phase II was necessary, and the resolution of Phase II will determine the plaintiff's burden of proof on its common law indemnity claim in Phase III.  Phase III will also encompass the trial of the plaintiff's remaining claims.

Hardie-Tynes ("HT") alleged four counts in its amended complaint: (1) breach of contractual indemnity clause; (2) common law indemnity; (3) breach of warranty; and (4) fraudulent suppression.  (Doc. 50).  After Phase I of trial, the Court found in favor of SKF on Count 1 when it determined that HT's breach of contractual indemnity claim must fail because neither party's terms and conditions controlled the underlying transaction.  The Court also found in favor of SKF on Count III insofar as that count alleged a breach of any written warranties contained in HT's terms and conditions.[1]  Thus, Counts 2, 4, and a portion of Count 3 remain.

Phase II of these proceedings was to determine "whether SKF made an effective/appropriate acceptance of [HT]'s tender of defense and indemnity." (Doc. 171 at 1).  As originally envisioned by the parties and the Court, Phase II would be necessary only if HT's terms and conditions controlled to the exclusion of SKF's.  However, given the holding in Phase I, the parties found themselves at a disagreement about whether Phase II was necessary.  The Court ultimately found that it was and set Phase II for trial.  Even though the Court determined that neither party's terms and conditions applied, Phase II was still necessary because of HT's common law indemnity claim.

---

[1] Count III remains pending insofar as it alleges SKF breached certain implied warranties.  (Doc. 220 at 7).

As will be discussed below, a Court deciding a common law indemnity claim must make various findings, one of which is whether an alleged indemnitor, like SKF, refused to participate in the settlement or prosecution of a case involving its alleged indemnitee, like HT, despite being notified by the indemnitee that it intended to settle. This is because an indemnitee's burden of proof for a common law indemnity claim is dependent on the answer to that question. Thus, the question of whether SKF effectively and appropriately accepted HT's tender of defense and indemnity was still relevant even in the absence of a valid contractual indemnity clause.

## I. Findings of Fact

At the bench trial of Phase II, the Court heard testimony from Charles Debardeleben, HT's president and general counsel. The parties also offered several exhibits that were admitted into evidence, and many other facts were not in dispute. The evidence revealed that HT was hired by Archer Western ("AW"), the general contractor for the Matlacha Bridge Project, to supply structural steel and machinery for the project. As part of its work on the project, HT purchased two bearings from SKF for the purpose of raising and lowering a leaf of the bridge. According to AW, the project was delayed because of a loud noise emanating from the bridge during the raising and lowering of the leaf. AW believed that SKF's

bearings were to blame and sued HT[2] in a Florida state court for, among other things, failing to provide SKF bearings and installation services that were free from defects and fit for their intended purposes.

Debardeleben testified that HT sent SKF a series of letters demanding that SKF defend and indemnify HT in the Florida litigation.  The first letter, sent on August 15, 2016, from HT's attorney to SKF's assistant general counsel, informed SKF about AW's counterclaim in the amount of 1.7 million dollars.  The letter referenced a clause contained in HT's terms and conditions requiring SKF to indemnify HT against AW's counterclaim.  The letter stated HT's belief that AW's claims had "substantial merit," that HT had little money and was unable to defend itself against AW's claims and demanded "that SKF take immediate steps to defend and indemnify [HT]."  (HT Ex. 64).[3]  The letter noted HT's response deadline in the Florida case and requested that SKF respond to the demand within 10 days.  *Id*.  The letter concluded by stating that HT would construe SKF's silence on the matter as an indication that SKF was refusing HT's request for defense and

---

[2] HT was the original plaintiff in that case having sued AW for the return of its retainage.  AW's claims were asserted in a counterclaim.

[3] The Court will cite to the trial exhibits by identifying the offering party and corresponding exhibit number.  The exhibits for Phase II of the trial are found in the Court's CM/ECF system at (Doc. 241) and (Doc. 242).

indemnification.  *Id.*  According to Debardeleben, SKF did not respond within that 10-day window.[4]

Debardeleben testified that HT sent SKF a second letter on September 6, 2016, in which it noted that, although SKF appeared to have turned the matter over to its insurer, that was not a sufficient response to HT's demand.  Therefore, HT said, it had filed the present lawsuit against SKF in this Court.  HT again asked SKF to accept its defense and indemnify it in the Florida case within seven days. HT concluded the letter by stating that if SKF failed to accept, HT would "likely have to ask Archer Western to consider an early mediation instead of protracted litigation."  (HT Ex. 67).

Over the next few weeks, the parties exchanged a series of emails and had discussions about mediating the case.  Ultimately, HT, AW, and SKF mediated the case on October 28, 2016, but were unable to reach a resolution.  However, and relevant here, SKF does not dispute that it attended the mediation.  As part of its case during Phase II, HT introduced a series of slides from a Microsoft Power Point presentation that were shown during the mediation.  (HT Ex. 73).  The fifth slide from that presentation, entitled "Summary of Claim," laid out a summary of the damages claimed by AW totaling nearly two million dollars.  *Id.*

---

[4] Debardeleben testified that HT did receive a letter on or about August 22, 2016, from SKF's insurer, Liberty Mutual, requesting various documents related to the Florida case.  Debardeleben stated that HT responded to those requests.  However, nothing more was said about Liberty Mutual and whether and to what extent it participated in the case.

During the same time the parties were discussing mediation, there were also emails between them regarding HT's indemnity demand.  In one email, counsel for SKF told HT that it would move to intervene in the Florida case and "provide a defense as to all claims related to SKF's work."  (SKF Ex. 31).  In response, HT sent SKF a letter explaining that SKF's proposed intervention would not be the same as an unconditional acceptance of HT's defense and indemnification.  (HT. Ex. 68).  This was because intervention, according to HT, served the purpose of protecting SKF's interests, not necessarily HT's.  The letter referenced statements by SKF's counsel as well as internal SKF emails, which were seen during mediation, suggesting that SKF might try to shift blame for AW's claims onto HT. *Id*.  Therefore, HT did not consider SKF's proposal to be an acceptance of its demand to defend and indemnify it.  According to Debardeleben, HT was unwilling to accept any defense or indemnity with a reservation of rights.

Further, HT's counsel expressed concern for how SKF could ethically represent HT's interests in the case with AW given that HT and SKF were adverse parties in this case, the complaint having been filed here a few months earlier.  *Id*. HT then stated its belief that SKF had yet to fully and appropriately accept HT's demand for defense and indemnity.  The letter concluded by informing SKF that HT intended "to move forward with pursuing a resolution with Archer Western" and requested a written response within three days should SKF reconsider its

position and undertake an unconditional defense and indemnity to AW's allegations. *Id*. Debardeleben testified that SKF did not respond in any way. On November 30, 2016, HT filed a status report in this case (Doc. 18) informing the Court that it had reached a settlement with AW in the Florida case and was in the process of memorializing their agreement. SKF, being a party to this case, was served with a copy of that status report.

As will be discussed in more detail below, the Florida litigation between HT and AW was resolved with the entry of a consent judgment in favor of AW. Prior to entry of that judgment, HT and AW executed a Memorandum of Understanding ("MOU"). (SKF Ex. 40). The MOU provided, among other things, that any money recovered from SKF in this case would be paid to AW in satisfaction of the consent judgment. The MOU laid out a precise formula for how money was to be distributed in the event of any type of recovery. However, the MOU provided that HT would owe AW nothing relating to the consent judgment unless and until it recovered money from SKF. It is undisputed that HT has never made a payment to AW related to the Florida case.

## II. Conclusions of Law

The body of Alabama case law regarding common law indemnity in cases like this one is sparse. In *Allstate Ins. Co. v. Amerisure Ins. Companies*, the Alabama Supreme Court held:

7

"The general rule on indemnity in tort cases is set out in 42 C.J.S. Indemnity § 21, which states in part:

"'It is a well-recognized rule that an implied contract of indemnity arises in favor of a person who without any fault on his part is exposed to liability and compelled to pay damages on account of the negligence or tortious act of another, the former having a right of action against the latter for indemnity.... This right of indemnity is based on the principle that everyone is responsible for his own negligence, and if another has been compelled by the judgment of a court having jurisdiction to pay the damages which ought to have been paid by the wrongdoer they may be recovered from him.' (Emphasis added [in *Travelers Indemnity* ].)

"This general rule sets out three prerequisites to a right of recovery: (1) that the indemnitee be without fault, (2) that the indemnitor be the party responsible, or primarily liable, and (3) that the indemnitee has been required to pay out money by a judgment of a court. This three-prong test is essentially the same as the elements of a common law action for indemnity, which are summarized in Restatement, Restitution, § 76:

"'A person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity from the other, unless the payor is barred by the wrongful nature of his conduct.'"

603 So. 2d 961, 963 (Ala. 1992), quoting *Travelers Indemnity Co. v. Firestone Tire & Rubber Co.*, 360 F.Supp. 1328, 1329 (S.D. Ala. 1973).

The Alabama Supreme Court has also addressed situations similar to the present case, i.e., where an indemnitee settles a claim and then seeks to impose that liability on the indemnitor.  In *Stone Bldg. Co. v. Star Elec. Contractors, Inc.*, 796 So. 2d 1076, 1090 (Ala. 2000), that court held:

The general rule is that, "if indemnity is sought against an indemnitor without notice of either the original suit or of the settlement by the indemnitee," then the indemnitee has the burden of establishing that it was actually liable to the plaintiff and that the settlement was a reasonable one. *Watts v. Talladega Fed. Sav. & Loan Ass'n*, 445 So.2d 316, 320 (Ala. Civ. App. 1984). However, if the indemnitor has been given notice of the action against the indemnitee and has been given an opportunity to defend or to settle the action, then the indemnitor "is precluded from contesting the indemnitee's liability in a subsequent indemnity or third-party action." *Id.*

> "Indemnity against losses does not cover losses for which the indemnitee is not liable to a third person, and which the indemnitee improperly pays. A person legally liable for damages who is entitled to indemnity may settle the claim and recover over against the indemnitor, even though he has not been compelled by judgment to pay the loss. In order to recover, the indemnitee settling the claim must show that the indemnitor was legally liable, and that the settlement was reasonable. In the event that an indemnitor is not afforded the alternative of participating in a settlement or conducting the defense against the original claim, an indemnitee settling the claim will have the burden of establishing actual liability to the original plaintiff rather than the lesser burden of showing potential liability.

> "However, when the indemnitor has notice of the claim and refuses to defend, the indemnitor is bound by any good faith reasonable settlement, and the indemnitee need only show potential liability.

>> "Practice guide: A practical device by which an indemnitee can protect against the awkward possibility of having to prove the original plaintiff's case against himself, the original defendant, is to offer the indemnitor before any settlement is concluded the choice of (1) approving the settlement or (2) taking over the defense of the case and

agreeing to hold the indemnitee harmless in any event for damages which may be assessed against him in excess of the amount of the proposed settlement. If the indemnitor approves the settlement or defends unsuccessfully against the original claim, the indemnitor cannot later question the indemnitee's liability to the original claimant. If the indemnitor declines to take either course, then the indemnitee will only be required to show potential liability to the original plaintiff in order to support his claim over against the indemnitor." 41 Am.Jur.2d Indemnity § 46 (1995) (footnotes omitted).

Thus, the Court must determine (1) whether HT gave SKF notice of its intent to settle with AW and (2) whether HT gave SKF the opportunity to defend the claims or otherwise participate in the settlement. The first question is virtually undisputed. The letters introduced at trial along with Debardeleben's testimony established that HT sent SKF at least three letters notifying it of HT's intent to settle with AW unless SKF was willing to assume an unconditional defense of the claims or otherwise participate in the settlement negotiations. Additionally, it is undisputed that SKF participated in the mediation of that case. Accordingly, there is no question that SKF had notice of the Florida case as well as the amounts of damages being claimed in that case by AW. The evidence also established that SKF was on notice that HT intended to settle with AW.

The second question is a bit murkier.  Although Debardeleben testified that SKF did not formally respond to any of HT's letters requesting defense and indemnification, there is no dispute that SKF filed a motion to intervene in the Florida case.[5]  (HT Ex. 74).  There was also credible testimony and evidence about discussions between the parties regarding SKF's proposed intervention.  That evidence demonstrated HT's concern that the proposed intervention was not the same as an unconditional defense and indemnification because, HT said, intervention would mainly protect SKF's interests and would not necessarily protect HT.  *See, e.g.*, (HT Ex. 68).  This was significant to HT because, on more than one occasion, SKF had indicated that it may try and shift some or all of the liability onto HT.  For example, in an email that was shown in the Power Point presentation during mediation, two SKF employees were discussing the issue of the noise emanating from the bridge and SKF's attempts to troubleshoot the issue. One employee, Rudy Bonfini, wrote that once their analysis was complete, "then the pissing match begins regarding who pays for that, SKF or Hardie Tynes."  (HT Ex. 73).  Bonfini then told the recipient, "I suspect [SKF] will try to push that onto HT."  *Id*.  Given SKF's apparent position, Debardeleben testified that HT was not inclined to accept anything other than an unconditional defense of and indemnification for AW's counterclaim.

---

[5] That motion was never ruled upon because the consent judgment was entered before the Florida court heard argument on the motion.

The question now becomes whether SKF's response to HT's demand, i.e., that it would intervene in the Florida case and "provide a defense as to all claims related to SKF's work" (SKF Ex 31), was tantamount to a refusal to participate in the Florida case, at least for the purposes of an indemnity claim. The Court holds that it was. Given the discussions noted above, HT understandably had concerns about whether SKF's intervention would adequately protect HT's interests. As noted, SKF told HT that it would "provide a defense as to all claims related to SKF's work." (SKF Ex 31). HT believed this was inadequate and would potentially create unwarranted liability for HT. At trial, SKF argued that its offer to defend "all claims related to SKF's work" was sufficient because AW's counterclaim was based solely on AW's contention that HT provided defective SKF bearings. (R. 77-78). Essentially, SKF's position was that because AW's counterclaim involved only the allegedly defective SKF bearings, SKF's offer to defend all claims related to SKF's work was the same as providing a defense to all claims involving HT.

However, Debardeleben disputed that characterization, and the Court agrees. In reviewing AW's counterclaim, the Court notes that although AW's counterclaim was centered on the SKF bearings, AW alleged that HT breached a purchase order the parties entered into. According to AW's counterclaim,

> Hardie-Tynes expressly agreed to indemnify and save harmless Archer Western, from and against claims, debts, demands, damages,

losses, liabilities, interest, attorney's fees, costs and expenses of whatsoever kind or nature at any time arising out of Hardie-Tynes's performance of *any of the terms and conditions of the Purchase Order* or which are caused or occasioned by, or claimed to be caused or occasioned by, any act, omission, fault or negligence, of Hardie-Tynes or anyone acting under its direction or control, or on its behalf in connection with incident to the work.

(HT Ex. 66)(emphasis added).  The counterclaim continued and alleged: "*As part of* the material and services provided by Hardie-Tynes under the purchase order, Hardie-Tynes provided two SKF bearings and a SKF representative to supervise the installation of the SKF bearings."  (HT Ex 66)(emphasis added).  Thus, it was conceivable that AW could attempt to hold HT liable for things other than the allegedly defective SKF bearings.  Accordingly, SKF's position that its offer to intervene and defend claims related to its work was the same as defending all claims against HT is not well taken.  Therefore, the Court holds that SKF's offer to intervene in the Florida case was not an appropriate and effective acceptance of HT's demands.

The Court is thus left with the following situation.  Upon being sued by AW for claims related to SKF's bearings, HT formally requested on several occasions that SKF unconditionally defend and indemnify it in the case.  SKF responded by indicating its intent to intervene, but that response was not an acceptance of HT's demand.  Therefore, SKF essentially refused to defend HT or offer input on the settlement negotiations despite having adequate notice of both the Florida case and

HT's intent to pursue a settlement with AW.  Accordingly, HT will need only to demonstrate that it was potentially liable to AW in order to succeed on that particular element of its common law indemnity claim in Phase III of the trial in this case.

The Court pauses here to address SKF's concern, expressed in various filings and arguments to the Court, that such a resolution is unfair because, SKF says, HT had no incentive to negotiate a lower settlement given the MOU's provision that HT would owe AW nothing unless it recovered from SKF in this case.  While the Court agrees that this is a justified concern, it notes that HT will still be required to prove in Phase III that its settlement with AW was both reasonable and entered in good faith.  Thus, SKF will have an opportunity to address this concern.

### III.    The MOU

As discussed above, the Florida case was resolved after HT agreed to a consent judgment based on its and AW's execution of the MOU.  SKF has argued that the MOU renders the consent judgment illusory because it does not require HT to pay AW anything unless and until it recovers from SKF in this case.  Further, SKF has argued that HT must actually pay the judgment before its common law indemnity claim is ripe.  It is undisputed that HT has not made a payment to AW in satisfaction of the judgment and that no such payment is due unless HT prevails in

this case.  Therefore, SKF says, HT's common law indemnity claim is not ripe and is due to be dismissed.  This argument arose at the trial of Phase II and in SKF's posttrial brief.  It was also raised in SKF's motion for summary judgment (Doc. 139) and in SKF's response to HT's second motion for partial summary judgment.  *See* (Doc. 151 at 49-52).  However, given the other issues at play when those motions were decided, i.e., whose terms and conditions applied to the transaction, the Court did not rule on this issue at that time.  However, given that the issue was briefed, in both the motion for summary judgment and the posttrial briefs, the Court now finds it appropriate to rule.

According to SKF, HT must "pay to play."  (R. at 20).  That is, SKF takes the position that in order for HT's common law indemnity claim to be ripe, it must first pay AW in satisfaction of the judgment in the Florida case.  In support of this argument, SKF, in its motion for summary judgment, cited *Jones v. Crawford*, 361 So. 2d 518, 521 (Ala. 1978), in which the Alabama Supreme Court held that "damages are unrecoverable where the plaintiff has not paid or is not liable for such items."  (Doc. 139 at 40).  SKF also cites *Allstate Ins. Co. v. Amerisure Ins. Co.*, 603 So. 2d 961, 963 (Ala. 1992) for the proposition that a plaintiff must be "required to pay out money by a judgment of a court" before it can succeed on an indemnification claim.

The Court does not find that these cases create the bright line rule advocated by SKF, i.e., that an indemnitee must actually make payment to the relevant third party before an indemnity claim in ripe.  In *Jones*, the court held that damages were not recoverable unless the plaintiff has paid the third party *or* is liable to them.  Similarly, *Allstate* speaks of an indemnitee being *required* to pay money by a judgment of a court.  This Court finds that the consent judgment in the Florida case does just that: it requires HT to pay money to AW.  Even though the MOU operates to relieve HT of its obligation under certain circumstances, the Florida judgment does not specifically mention or incorporate the MOU.  Rather, it affirmatively states that "Archer Western is entitled to Judgement herein on its Counterclaim against, and shall recover from Hardie-Tynes, the sum of Two Million Forty-One Thousand Six Hundred Thirteen Dollars…."  (SKF Ex. 41).  Thus, HT is liable to AW and required by that judgment to pay AW the amount noted.

SKF also cited *Mulhall v. UNITE HERE Local 355*, 618 F. 3d 1279, 1291 (11th Cir. 2010) for the proposition that a claim like HT's is unripe if the claimed injury "depends on the resolution of other judicial proceedings."  Similarly, SKF cited *Cross Creek Pictures, LLC v. S & S Aviation, Inc*., 2018 WL 4255737, *3 (N.D. Ga. Sept. 5, 2018) (citing *Armstrong v. Alabama Power Co*., 667 F.2d 1385 (11th Cir. 1982), for the proposition that "a claim for indemnification premised on

potential liability to a third party is not justiciable under Article III.")  However, the Court finds these cases to be distinguishable given the fact that HT's claims regarding SKF's liability will ultimately be decided in Phase III of these proceedings and do not depend on the resolution of a case in some other court as did the claims in *Mulhall* and *Cross Creek Pictures*.

In its Phase II posttrial brief, SKF cited additional cases in support of its proposed pay-to-play rule.  For example, SKF cited *Travelers Indem. Co. v. Firestone Tire & Rubber Co.*, 360 F. Supp. 1328 (S.D. Ala. 1973) in which a federal court in the Southern District of Alabama held that the general rule in indemnity cases is that

> an implied contract of indemnity arises in favor of a person who without any fault on his part is exposed to liability and compelled to pay damages on account of the negligence or tortious act of another, the former having a right of action against the latter for indemnity.... This right of indemnity is based on the principle that everyone is responsible for his own negligence, and if another person has been compelled by the judgment of a court having jurisdiction to pay the damages which ought to have been paid by the wrongdoer they may be recovered from him.

But, like the cases noted above, the language in *Travelers* speaks of an indemnitee being "compelled by a judgment of a court" to pay damages.  As noted above, the judgment of the Florida court does just that.  To hold that an indemnitee must actually write a check and have it clear before it may recover would work inequitable results on indemnitees who find themselves insolvent or otherwise

17

unable to pay judgments.  Such is the case here.  It is undisputed that HT is no longer doing business, and the Court finds Debardeleben's testimony regarding HT's inability to pay the judgment to be credible.

SKF also cited *Sharp Realty & Mgmt., LLC v. Capitol Specialty Ins. Corp.*, 2012 WL 2049817 (N.D. Ala. May 31, 2012), in support of its proposition.  In *Sharp*, the parties found themselves in a similar situation to this case.  SKF aptly described the complicated factual background of *Sharp* in its posttrial brief (Doc. 244 at 3-4) and quoted the following passage from the opinion:

> The practical effect of the settlement is that [the plaintiff,] SRM[,] will never be called upon to satisfy a judgment against it in the Shades Parkway lawsuit, because the plaintiff there, Shades Parkway, cannot recover from SRM unless SRM is backed up by Allied or Capitol [its carriers]. This creates a conundrum. Because there is no possibility that SRM itself will become "legally obligated to pay" damages out of its own pocket, Allied [the carrier] has no obligation to ... indemnify, SRM.

*Id*. at *17.

The Court first notes that *Sharp* is not binding authority.  However, even if it were, HT correctly pointed out that the legal underpinning of that holding has been overruled.  In support of its holding, the court in *Sharp* noted that another judge of this court "applied the same 'legally obligated to pay' language, and held that when an insured reaches a settlement that results in an impossibility that the insured will ever pay anything from its own pocket, the insurer is simultaneously

relieved. When an insured effectively insulates itself from liability, it insulates its insurer from liability." *Id*., quoting *Bendall v. White*, 511 F.Supp. 793 (N.D. Ala. 1981).

*Bendall* involved a covenant not to execute between an insured driver and a plaintiff who sued him after an automobile accident.  In settling with the insured driver, the plaintiff agreed not to execute the judgment against the insured driver's personal assets.  Rather, the plaintiff would only be entitled to the proceeds, if any, from the insured driver's case against his insurance carrier.  The court in *Bendall* noted:

> There appear to be no cases on the applicability of a "covenant not to execute" in this jurisdiction. However, the Oregon Supreme Court in a well-reasoned "in banc" decision held that a "covenant not to execute" made the insured not legally obligated to pay the amounts in question. *Stubblefield v. St. Paul Fire and Marine Insurance Company*, 267 Or. 397, 517 P.2d 262 (1973). Following the reasoning of the Oregon case, this court holds that due to the covenant not to execute, Christopher Eugene White, if he is an "insured," is not legally obligated to pay the judgment and, therefore, the judgment amount is not covered by either insurance policy.

511 F. Supp. at 794-95.  But the "well-reasoned" decision in *Stubblefield* was subsequently overruled by the Oregon Supreme Court in *Brownstone Homes Condo. Ass'n v. Brownstone Forest Heights*, LLC, 363 P.3d 467, 480 (Or. 2015) ("In short, we conclude that *Stubblefield* erred when it concluded that a covenant not to execute obtained in exchange for an assignment of rights, by itself, effects a complete release that extinguishes an insured's liability and, by extension, the

insurer's liability as well."). Accordingly, this Court does not find *Sharp* to be persuasive or instructive in this case.

In its posttrial brief, SKF cited to several other cases in support of its proposed pay-to-play rule. However, the language in those cases is similar to the language from the other cases SKF cited, i.e., those cases speak of an indemnitee being "compelled to pay damages" or "required to pay damages." *See e.g.*, (Doc. 244 at 5-7). But as the Court noted above, the judgment from the Florida court does impose liability on HT independent of the MOU. Therefore, HT sustained the required damages when the Florida judgment was entered. It is not required to prove actual payment before pursuing its common law indemnity claim. Were such proof required, alleged indemnitees like HT who are without the funds to pay such a judgment would be unjustly foreclosed from pursuing claims against an indemnitor that it believes to be wholly responsible.

## IV. Conclusion

For the foregoing reasons, the Court finds that HT's common law indemnity claim survives as a matter of law. Further, the Court finds that HT notified SKF of its intent to settle with AW and gave SKF an opportunity to participate in the case. Although SKF moved to intervene in the case, it did not accept HT's demand for defense and indemnity. Therefore, HT will be required to prove only potential liability to AW as part of its common law indemnity claim in Phase III.

**DONE** and **ORDERED** December 27, 2022.

**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE